**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **BRIAN MOAT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 3:21-cv-00807** |
| | ) | |
| **v.** | ) | **JUDGE TRAUGER** |
| | ) | |
| **METROPOLITAN GOVERNMENT** | ) | **JURY DEMAND** |
| **OF NASHVILLE AND DAVIDSON** | ) | |
| **COUNTY, TENNESSEE,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I.      INTRODUCTION

Plaintiff Brian Moat ("Mr. Moat") worked for approximately 26 years as a firefighter for the Metropolitan Government of Nashville and Davidson County, Tennessee ("Defendant"). After Mr. Moat was injured in the line of duty, Defendant failed to engage in the interactive process in good faith and never offered him a *reasonable* accommodation, as required by the ADA. Instead, all Defendant offered was an *unreasonable* option that significantly reduced Mr. Moat's salary – despite the availability of reasonable accommodations that would not result in any salary reduction. Defendant did, however, provide accommodations to similarly situated younger employees that did not result in a significant reduction of their salaries. Based on the foregoing, Mr. Moat asserts that Defendant: (1) violated the Americans with Disabilities Act (the "ADA") when it failed to accommodate him and reduced his salary because of his disability; and (2) the

Age Discrimination in Employment Act (the "ADEA") and the Tennessee Human Rights Act (the "THRA") when it treated him less favorably than similarly situated younger employees.

## II.  FACTUAL BACKGROUND

### A.  Mr. Moat's Employment and Injury

Mr. Moat worked for the Nashville Fire Department ("NFD") for approximately twenty-six years. (Moat Decl. ¶ 3). He was a very good employee and received positive performance evaluations (Moreland Dep. 36; Ex. 2, Moat Performance Evaluations). On December 12, 2019, Mr. Moat was injured on the job while responding to an EMS call. (Moreland Dep. 37-38; Ex. 2 to Moreland Dep.). His treating physician, Dr. Oran Aaronson, diagnosed him with lumbar spondylosis and he underwent lumbar surgery on December 20, 2019. (Ex. 4, Moat Medical Records at MED RECS 54). As a result of this injury, Mr. Moat was temporarily unable to work while he recovered. (Ex. 12, Form 201 Injury Reports, pages 1-5).

### B.  Defendants' Medical Leave and Light Duty Policies and Practices.

Employees with on-the-job ("IOD") injuries or illnesses are subjected to Defendant's maximum leave policy (the "Maximum Leave Policy"), which provides that employees can only have a cumulative six months of medical leave and/or light duty for any one injury. (Ex. 5, Excerpts from 2019 and 2020 Civil Service Rules at MG6251-52, MG6331-33).[1] The Maximum Leave Policy refers to both IOD medical leave and IOD light duty as "IOD leave." (*Id.*). Employees can request a waiver of the Maximum Leave Policy if they "present medical information confirming that [they] will be capable of returning to full, unrestricted duty within a specified and reasonable

---

[1] Plaintiff attached excerpts of the Civil Service Rules that were in effect from July 9, 2019 through July 13, 2020 and copies of the Civil Service Rules that were in effect from July 14, 2020 through August 18, 2021 to his Notice of Filing; however, the policy in question is the same in both versions of the Rules.

amount of time." (*Id.*). Such a request must be submitted prior to the exhaustion of the six months of leave. (*Id.*). After six months (assuming they did not obtain a waiver), employees must go on a disability pension; however, the Maximum Leave Policy provides that Defendant should "investigate the possibility of accommodating the employee's restrictions before the pension application is processed." (*Id.*). Employees receive 100% of their pay for the first two weeks of IOD medical leave and 90% of their pay for the remainder; however, employees on light duty for IOD injuries receive 100% of their pay. (*Id.*).

During the time period relevant to this case, two NFD employees handled matters related to light-duty assignments within the NFD – Chief of Occupational Health and Safety, Jerry Moreland ("Chief Moreland") and NFD employee Jamie Natali ("Ms. Natali"). (Moreland Dep. 14, 24-27; Natali Dep. 20-21, 22-27, Summers Dep. at 46-47). Both had authority to decide where to place employees who need light duty positions. (Moreland Dep. 26-27; Natali Dep. 26-27). Both testified that when an employee needs a light duty position, they simply contact the commanders of the NFD's different divisions to find a light duty assignment for the employee. (Moreland Dep. 27; Natali Dep. 23-24). Both testified they can typically find light duty positions for employees who need them. (Moreland Dep. 28; Natali Dep. 25). Both testified they assign employees to jobs according to their restrictions. (Moreland Dep. 26; Natali Dep. 34-35). Both testified that light duty assignments include "desk jobs" or sitting jobs. (Moreland Dep. at 25-26; Natali Dep. 23-24).

Along with NFD's Executive Administrator, Jamie Summers ("Ms. Summers"), Chief Moreland also handles matters related to employees' requests for waivers of the Maximum Leave Policy. (Moreland Dep. 32, Summers Dep. 66-67). Specifically, when an employee is nearing the end of their six months of cumulative leave and/or light duty time for an IOD injury, Chief Moreland contacts the employee and their case manager regarding the waiver. (Moreland Dep.

32). Chief Moreland advises employees regarding the information they need to provide to request a waiver. (Moreland Dep. 32, 34-35). Employees requesting waivers provide Chief Moreland with documentation supporting their request. (Moreland Dep. 32-35; Summers Dep. 69). Chief Moreland then submits the information related to the waiver request to Ms. Summers, who reviews it. (Summers Dep. 68-69). Ms. Summers then determines whether the NFD will "support" the employee's request for a waiver. (Moreland Dep. 33; Summers Dep. 66-67).

## C.     Mr. Moat's Request for a Waiver.

On April 21, 2020, Dr. Aaronson stated he was "optimistic" that Mr. Moat could return to work as a firefighter twelve months after his surgery – *i.e.*, in December 2020. (Ex. 4, Moat Medical Records at MED RECS 33). Under the Maximum Leave Policy, however, Mr. Moat's IOD time was set to expire on June 22, 2020. (Moreland Dep. at 64; Ex. 8, June 18, 2020 Emails). In accordance with the NFD's practices, Mr. Moat discussed the process for requesting a waiver with Chief Moreland. (Moat Decl. at ¶¶ 6, 7). Chief Moreland told Mr. Moat he must submit a letter requesting the waiver, as well as provide a letter from his treating physician supporting the request. (Moat Decl. at ¶ 8). Mr. Moat and Chief Moreland exchanged text messages regarding the process for requesting a waiver. (Moreland Dep. 40-41; Ex 4 to Moreland Dep.). Chief Moreland also sent Mr. Moat emails containing instructions on the documentation needed to provide regarding his request for a waiver, including instructions on what Dr. Aaronson's letter should say and a sample letter requesting a waiver. (Moreland Dep. at 43-44; Ex. 5 to Moreland Dep.).

On April 21, 2020, as instructed, Mr. Moat sent his letter requesting a waiver directly to Chief Moreland. (Ex. 5 to Moreland Dep.; Moat Decl. at ¶ 9). In his letter, Mr. Moat explained that he was improving and that Dr. Aaronson opined that a "6-month extension would allow me enough time to return to unrestricted work." (Ex. 6 to Moreland Dep. at page 2). The statements

in Mr. Moat's letter were supported by both the most recent notes from his case manager, Karen Daniel ("Ms. Daniel"),[2] which stated Mr. Moat was making "steady improvement," and the most recent treatment notes from Dr. Aaronson, which stated that Dr. Aaronson was optimistic Mr. Moat would return to work as a firefighter in December 2020. (Ex. 4, Moat Medical Records at 33; Ex. 6 to Moreland Dep. at page 3).

Chief Moreland also communicated directly with Ms. Daniel regarding obtaining a letter from Dr. Aaronson to support Mr. Moat's request for a waiver. (Moreland Dep. at 46-47; Ex. 7 to Moreland Dep.). On May 18, 2020, Ms. Daniel emailed a letter from Dr. Aaronson supporting Mr. Moat's request directly to Chief Moreland. (Ex. 7 to Moreland Dep.). In Ms. Daniel's email to Chief Moreland, she stated: "Please see attached and let me know if it is sufficient." (*Id.*). Dr. Aaronson's letter, dated May 17, 2020, stated that Dr. Aaronson was hopeful Mr. Moat would return to work as a firefighter in December 2020. (Ex. 6 to Moreland Dep. at page 6). Chief Moreland did not respond to Ms. Daniel's email to tell her that Dr. Aaronson's letter was not "sufficient" or that Dr. Aaronson needed to provide any additional information. (Ex. 7 to Moreland Dep.).

After receiving the documentation supporting Mr. Moat's request for a waiver, Ms. Summers did not seek any clarification from anyone with medical training for help interpreting the Ms. Daniel's or Dr. Aaronson's notes. (Summers Dep. 95). Furthermore, no one told Mr. Moat that the information he provided was insufficient. (Ex. 3, Moat Decl. at ¶ 14). Additionally, no one reached out to Mr. Moat to ask whether he and Dr. Aaronson had discussed Mr. Moat's prospects for being released to light duty. (*Id.* at ¶ 16).

---

[2] Defendant contracts with Eckman/Freeman to provide case management services for IOD-related impairments. (Moreland Dep. 21-22).

Ms. Summers decided the NFD would not support Mr. Moat's request for a waiver. (Summers Dep. 66-67, 91-92, Ex. 6 to Summers Dep. at page 1). Within the last five years, Defendant approved **_all_** requests for waivers by NFD employees if the NFD supported the waiver. (Collective Ex. 9 (Plaintiff's First Interrogatories to Defendant, Defendant's Responses to Plaintiff's First Interrogatories, email from Brook Fox containing supplemental response to Interrogatory No. 12);[3] Ex. 10, IOD Waiver Spreadsheet).

### D. Defendant Denies Mr. Moat's Request for Waiver.

At the June 9, 2020 Civil Service Board meeting, Defendant denied Mr. Moat's request for a waiver. (Ex. 11, Transcript of June 9, 2020 Civil Service Meeting at 29). At the meeting, Ms. Summers spoke on behalf of the NFD and stated she was "fearful that come December he still will not be the – ready to return to work." (*Id.* at 5). She did not consult with any medical doctors, including Dr. Aaronson, regarding whether her "fear" was justified. (Summers Dep. 104-105, 108-109). She testified her "fear" was based on her own interpretation of Mr. Moat's records and on her observation of other employees who "s[at] out on pension" and then did not "return to work," not on an assessment of Mr. Moat's particular situation. (*Id.* at 109-110, 131-33).

Ms. Summers also made several material misstatements and/or misrepresentations at the Commission meeting. For example, she stated "we have only had one six-month request come before this Commission in the past;" however, in her deposition, she admitted that was untrue. (Ex. 11, Transcript of June 9, 2020 Civil Service Meeting at 10; Summers Dep. at 129-130). Ms. Summers also stated that Mr. Moat's request was the first request "that we've had, that I'm aware of, that said, 'We don't really know when he's coming back.'" (Ex. 11, Transcript of June 9, 2020

---

[3] Plaintiff filed Collective Exhibit 9 for the sole purpose of demonstrating that Exhibit 10 (MG 00002) was produced by Defendant in response to Plaintiff's Interrogatory No. 12.

Civil Service Meeting at 23). Nothing in the materials Dr. Aaronson submitted, however, stated that Dr. Aaronson did not "really know when [Mr. Moat] was coming back;" to the contrary, Dr. Aaronson's May 17, 2020 letter provided an estimated return to work date of December 10, 2020. (Ex. 6 to Moreland Dep. at page 6).

At the hearing, Defendant did not ask Mr. Moat to obtain any additional information from Dr. Aaronson or allow Mr. Moat to return to Dr. Aaronson to be released to return to work on light duty; rather, Defendant simply denied Mr. Moat's request. (Ex. 11, Transcript of June 9, 2020 Civil Service Meeting). Defendant held no discussion at the meeting regarding whether Mr. Moat's requests for an accommodation would impose an undue hardship on Defendant. (*Id.*).

At the same hearing where Defendant denied Mr. Moat's request for an extension, Defendant approved a waiver request submitted by 32-year-old NFD firefighter Michael Lawrence. (Ex. 13, Minutes of the June 9, 2020 Civil Service Commission Meeting at MG 3294; Collective Ex. 9; Ex. 10, IOD Waiver Spreadsheet). Mr. Lawrence was injured in the line of duty in November 2019. (Ex. 16, Staff Report; Ex. 13, Meeting Minutes). After this IOD injury, Mr. Lawrence was placed on light duty. (Ex. 17, Defendant's Responses to Third Discovery Requests at page 2-3). His IOD leave was set to expire on July 8, 2020. (*Id.*) At the June 9, 2020 hearing, the Commission approved a one-month extension of Mr. Lawrence's IOD leave (*i.e.*, until August 10, 2020). (Ex. 16, Staff Report; Ex. 13, Meeting Minutes at MG 3294). However, the NFD personnel then temporarily "assigned" Mr. Lawrence to the same light duty position he had been performing until February 19, 2021, without additional Commission approval. (Ex. 17, Defendant's Responses to Third Discovery Requests at page 2-3; Collective Ex. 18).

E.      **Mr. Moat Requests a Light Duty Assignment.**

On June 18, 2020 – *before* the June 22, 2020 expiration of Mr. Moat's six months of maximum leave – Dr. Aaronson released Mr. Moat to light duty effective as of June 19, 2020. (Ex. 12 at page 6). Mr. Moat emailed a copy of Dr. Aaronson's note releasing him to light duty to Ms. Summers at 1:00 p.m. on June 18, 2020; in that email, Mr. Moat asked to be placed light duty until he could be further evaluated by Dr. Aaronson in August 2020.[4] (Summers Dep. at 143; Exs. 17, 18 to Summers Dep.). Ms. Summers responded fifty-six minutes later, denying Mr. Moat's request and stating that Mr. Moat is "not eligible for light duty." (Summers Dep. at 144; Ex. 18 to Summers Dep.).

In her deposition, Ms. Summers admitted she did not talk to anyone to determine if there was light duty available for Mr. Moat and performed no individualized assessment regarding whether Mr. Moat could perform any light duty positions with his restrictions. (Summers Dep. at 145, 164-66). Ms. Summers did not reach out to Mr. Moat to ask him any questions regarding his request for light duty before she denied his request. (Moat Decl. at ¶ 20). Ms. Summers stated she made the decision to deny the light duty based in part on an assumption that Mr. Moat simply called Dr. Aaronson and asked to be released to light duty;[5] however, she did not ask Mr. Moat any follow up questions regarding this assumption before she responded and denied the request. (Summers Dep. at 146, 147, 150-53, 155, 157). Indeed, Ms. Summers admitted she did not

---

[4] In his June 18, 2020 treatment note, Dr. Aaronson stated Mr. Moat showed "significant improvements" and that he was optimistic he would return to full duty in September 2020. (Ex. 4, Medical Records at 27).

[5] Of course, Mr. Moat did not just call Dr. Aaronson and ask to be released to light duty; he had an in-office visit on June 18, 2020, and Dr. Aaronson released him to light duty then. (Ex. 4, Medical Records at 25-27; Moat Decl. at ¶ 17).

consider whether Defendant had any obligation to make an exception to its maximum leave policy once Dr. Aaronson released Mr. Moat to light duty. (*Id.* at 157-58).

**F.      Mr. Moat is Forced to Go on Pension, Rather than Work.**

Because Defendant rejected Plaintiff's request for additional medical leave and/or light duty, he was forced to go on a disability pension. (Moat Decl. ¶ 23). The disability pension pays between 50-60% of an employee's compensation. (Summers Dep. 168). By contrast, employees on IOD light duty are paid 100% of their salary and employees on IOD medical leave are paid 90% of their salary. (Ex. 5, Civil Service Rules at MG6252, 6333). Mr. Moat was released to return to work without restrictions on March 9, 2021. (Ex. 12, Form 201s at page 12). Thereafter, Defendant required Mr. Moat to complete a physical agility examination before returning to work; he passed his physical agility examination and then returned to work as a firefighter. (Moreland Dep. at 66; Ex. 19, Return to Work Form).

### III.      LEGAL STANDARD

Summary judgment is appropriate only if the movant shows there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Blanchet v. Charter Commc'ns, LLC*, 27 F.4th 1221, 1226 (6th Cir. 2022).   "A genuine dispute of material fact exists if a reasonable jury – viewing the evidence in favor of the nonmovant – could decide for the nonmovant." *Id.* "'Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge' when [they are] ruling on a motion for summary judgment." *Id.* (internal citations omitted). "'Where there is a genuine issue of material fact, summary judgment is not appropriate.'" *Id.* (internal citations omitted).

# IV.   <u>ARGUMENT</u>

## A. **Plaintiff's Disability Claims.**

Defendant violated the ADA when it refused Mr. Moat's request for a reasonable accommodation in the form of a waiver of the Maximum Leave Policy. "The ADA prohibits discrimination against a qualified individual based on a disability." *Blanchet*, 27 F.4th at 1227 (citing 42 U.S.C. 12112(a)). "Disability discrimination includes a failure to make reasonable accommodations." *Id.* To prevail on a failure to accommodate claim, a plaintiff must show that "(1) []he is disabled, (2) []he is 'otherwise qualified' for the position despite his or her disability.'" *Id.* at 1228 (internal citations omitted). To show they are "otherwise qualified" for a position, a plaintiff must show that "[]he is 'otherwise qualified' for the position despite his or her disability: (a) without accommodation from the employer; (b) with an alleged 'essential' job requirement eliminated; or (c) with a proposed reasonable accommodation.'" *Id.* (internal citations omitted). The burden then shifts to the employer to "prov[e] that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon' the company." *Id.*

Defendant *does not* dispute that Mr. Moat is disabled for purposes of the ADA. Furthermore, Defendant *makes no* undue hardship argument. Rather, Defendant argues: (1) Mr. Moat was not otherwise qualified; and (2) Mr. Moat's proposed accommodations were not reasonable. For the reasons set forth below, both arguments fail; therefore, Defendant's Motion should be denied.

### 1. *Plaintiff was otherwise qualified for his position with a proposed reasonable accommodation.*

Contrary to Defendant's arguments, Mr. Moat was otherwise qualified for his position with a proposed reasonable accommodation. In fact, the Sixth Circuit recently rejected the *exact*

argument made by Defendant – *e.g.,* that a *temporary* inability to perform the essential functions of a job makes the employee unable to satisfy the "otherwise qualified" prong of a reasonable accommodation claim. In *Blanchet v. Charter Communications, LLC*, 27 F.4th 1221, 1229 (6th Cir. 2022), the defendant asserted that the plaintiff was not "otherwise qualified" because attendance was an essential function of her job and she was temporarily unable to report to work because of her disability. *Id.* at 1228-29. The Sixth Circuit soundly "reject[ed] [defendant's] argument that [plaintiff] was not qualified because attendance was an essential function of her work," because the plaintiff "was not requesting an accommodation that would permanently remove attendance as a requirement for her position. . . . In asking for an extension of medical leave, [plaintiff] requested a temporary accommodation in the hopes that she could fulfill the attendance requirement once her medical leave was over." *Id.* at 1229. As the *Blanchet* court explained, when analyzing "otherwise qualified" element in the context of a case involving a failure to accommodate, the proper inquiry is whether the plaintiff would be "'otherwise qualified' to perform [their] essential job functions with [their] proposed accommodation, in other words, *when [they] returned to work.*" *Blanchet*, 27 F.4th at 1229 (emphasis added).

In this case, as in *Blanchet*, Mr. Moat was not requesting a permanent waiver to the maximum leave policy – *e.g.*, permanent light duty. Rather, just as in *Blanchet*, he was asking for *temporary* reasonable accommodations that would allow him to return to work as a firefighter (which he did). (Moreland Dep. at 66; Ex. 19, Return to Work Form). Because the proper inquiry is whether Mr. Moat was qualified to work as a firefighter in March 2021, he was "otherwise qualified" and Defendant's motion should be denied.

Furthermore, the fact that Mr. Moat initially asked for an extension of his IOD leave time until December 2020, or light duty until August 2020, but was not cleared to return to work without

restrictions until March 2021, does not render Mr. Moat not "otherwise qualified." Defendant asserts Mr. Moat was "entirely off work until March 8, 2021" to support its argument, but this is inaccurate. Dr. Aaronson's notes from June 18, 2020, August 18, 2020, and November 24, 2020 all indicate that Mr. Moat could perform light duty; at a minimum, this creates a disputed fact that should preclude summary judgment. (Ex. 12, Form 201 Reports at pages 6, 7, 11). Even if Mr. Moat ultimately needed a different accommodation than he originally proposed (*e.g.*, light duty until March 8, 2021, rather than until August 2020), Defendant "had an ongoing duty to engage in an interactive process with Plaintiff about accommodations" for his injuries. *Camillo v. Campbell Clinic, P.C.*, 2021 U.S. Dist. LEXIS 38692, at *15 (W.D. Tenn. March 2, 2021). "'The employer's obligation to engage in the interactive process extends beyond the first attempt at accommodation and *continues when the employee asks for a different accommodation* or where the employer is aware that the initial accommodation is failing and further accommodation is needed.'" *Id.* at *15-16 (quoting *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1138 (9th Cir. 2001) (emphasis added). In other words, Defendant had an ongoing obligation to assess Mr. Moat's needs for an accommodation, including his needs for a different or modified accommodation than he originally proposed; it cannot use its failure to do so to now assert that Mr. Moat was not "otherwise qualified."

## 2. *Mr. Moat's Accommodation Requests Were Reasonable.*

In a footnote, Defendant also asserts that Mr. Moat's request for an accommodation was unreasonable; however, this argument fails. It is rarely appropriate to grant summary judgment based on the "reasonableness" of an accommodation because "the reasonableness of an accommodation is generally a question of fact." *Keith v. City of Oakland*, 703 F.3d 918, 927 (6th

Cir. 2013). Regardless, genuine issues of material fact should preclude summary judgment on these grounds.

### a. Dr. Aaronson's letter was sufficiently definite.

Defendant first argues that Mr. Moat's request for an exception to the Maximum Leave Policy was unreasonable because Dr. Aaronson's letter did not provide a "certain or credibly proven end" to Mr. Moat's leave. However, Dr. Aaronson's letter did provide an opinion regarding a return-to-work date for Mr. Moat – December 10, 2020. (Ex. 6 to Moreland Dep. at page 6). The Sixth Circuit recently rejected the argument that a request for a reasonable accommodation supported by a doctor's note containing an *estimated* date of return is "unreasonable *per se*." *Blanchet*, 27 F.4th at 1230. In *Blanchet*, the plaintiff took a medical leave of absence starting on July 11, 2016. *Id.* at 1225. The plaintiff was initially supposed to be on a leave of absence until September 4, 2016; however, she requested multiple extensions to continue recuperating – first until January 8, 2017, then until February 1, 2017, and lastly until April 2017. *Id.* When the plaintiff requested her last extension, she provided a doctor's note stating her "return to work date was 'unknown at this time' but that [defendant] should 'expect April' as a timeframe for her return to work." *Id.*

In *Blanchet*, the Sixth Circuit rejected the same argument advanced by Defendant in this case – that "a doctor's estimate of a return-to-work date is not a 'clear prospect of recovery.'" *Id.* at 1231. The Court held that plaintiff provided a clear prospect regarding her return to work because, among other reasons, she did not have a history of absenteeism prior to her need for a reasonable accommodation, "requested leave for specified periods," "provided medical support for each of her absences in advance," and was being treated with "therapy and medications." *Id.* at 1231. Likewise, in this case, Mr. Moat did not have a history of absenteeism prior to his need

for a reasonable accommodation, (Moat Decl. at ¶ 4); he requested leave for a specified period (Ex. 6 to Moreland Dep. at page 2, 6; Exs. 17 and 18 to Summers Dep.); he provided medical support from Dr. Aaronson supporting his request (Ex. 6 to Moreland Dep. at page 6; Exs. 17 and 18 to Summers Dep.); and Dr. Aaronson was actively treating him when he requested the reasonable accommodation. (Ex. 6 to Moreland Dep.; Ex. 4, Medical Records at MED RECS 25-33). Thus, just as in *Blanchet*, Mr. Moat's request was reasonable because Dr. Aaronson's letter was sufficiently definite considering all the circumstances. *See also Suboh v. Abacus Corp.*, 2022 U.S. Dist. LEXIS 190587, at *18-19 (S.D. Ohio Oct. 18, 2022) (rejecting Defendant's argument that a leave request was unreasonable where it was supported by a doctor's note providing an "*estimated* return to work date" of August 10, 2020 following completion of an intensive outpatient program, because the plaintiff's doctor's note – which provided both an estimated date and a plan for recovery (*e.g.*, completion of an outpatient program) – was sufficiently definite so as not to render her request unreasonable) (emphasis added).

Moreover, as in *Blanchet*, Defendant did not tell Mr. Moat that Dr. Aaronson's letter was somehow deficient, nor did Defendant contact Mr. Moat "to request medical records or to inquire for further information about [his] current condition." *Id.* at 1231. (Moat Decl. at ¶¶ 12-16, 20-22). Defendant "cannot now use its failure to engage in the interactive process" – *e.g.*, asking further questions regarding the alleged deficiencies in Dr. Aaronson's letter – "to argue that [Mr. Moat's] proposed accommodation was unreasonable." *Id.*

Furthermore, the facts of this case are easily distinguishable from the case cited by Defendant to support its proposition, *Maat v. County of Ottawa*, 657 Fed. App'x 404 (6th Cir. 2016). Specifically:

- The plaintiff in *Maat* requested an "open-ended" medical leave after being diagnosed with a serious condition. *Id.* at 413. By

14

contrast, Mr. Moat did not request "open-ended" medical leave. (Ex. 6 to Moreland Dep. at page 2, 6; Exs. 17 and 18 to Summers Dep.);

- When the plaintiff in *Maat* requested leave, her "medical condition had worsened [over the previous six months since her diagnosis], she was 'completely incapacitate[d]' and expected to undergo surgery, and 'at that particular time [her doctor] had no idea of how long it would take' with 'the medications and the treatment.'" *Id.* By contrast, when Mr. Moat requested an exception to the maximum leave policy in June 2020, his condition was improving, he was not expected to undergo surgery, and Dr. Aaronson gave no indication that he had "no idea" of how long it would take for him to recover. (Ex. 6 to Moreland Dep. at page 2, 6; Ex. 11, Transcript of Civil Service Commission Meeting at 8, 11, 14-15; Exs. 17 and 18 to Summers Dep.; Ex. 4, Medical Records at 27, 33).

- The plaintiff in *Maat*'s doctor "did not indicate the 'probable duration of [plaintiff's] condition," but rather, stated that plaintiff "would have to undergo further testing, 'multiple medication trials,' '[n]euro/vascular surgery,' and oncological examination." *Id.* By contrast, Dr. Aaronson did indicate the probable duration of Mr. Moat's condition and did not indicate that Mr. Moat needed "multiple medication trials," further surgery, or oncological examination. (Ex. 6 to Moreland Dep. at 6; Ex. 17 to Summers Dep.).

- The plaintiff in *Maat* and her doctor "had not discussed whether six weeks of leave 'was too long or long enough,'" and the plaintiff's doctor noted that plaintiff "didn't seem to be getting better." *Id.* By contrast, when Mr. Moat requested the reasonable accommodation, his condition had improved since his December 12, 2019 injury. (Ex. 6 to Moreland Dep. at page 2, 6; Ex. 11, Transcript of Civil Service Commission Meeting at 8, 11, 14-15; Exs. 17 and 18 to Summers Dep.; Ex. 4, Medical Records at 27, 33).

In sum, because a "reasonable jury could find that [Mr. Moat] could recover from [his] illness within an acceptable time," there is a genuine issue of material fact regarding the reasonableness of Mr. Moat's request, and summary judgment should be denied. *Blanchet* at 1231.

b. **Ms. Summers had authority to receive Mr. Moat's reasonable accommodation request.**

In another footnote, Defendant asserts that Mr. Moat's request for light duty was unreasonable because Mr. Moat directed the request to Ms. Summers, who allegedly had no authority to act on the request. This is contradicted by the fact that Ms. Summers *did* act on Mr. Moat's request for light duty – she responded to his request less than an hour after he emailed it to her and denied it. (Ex. 18, June 18, 2020 Emails). Ms. Summers also gave reasons other than "lack of authority" for denying the request – specifically, her belief that Mr. Moat simply called Dr. Aaronson and asked to be released to light duty. (Summers Dep. at 146, 147, 150-53, 155, 157). In other words, she used her discretion, and did not merely rely on Defendant's internal policies, when she denied Mr. Moat's request for light duty – undermining any assertion that she had no authority to act on his request. (*Id.*).

Furthermore, there are genuine issues of material fact regarding whether Mr. Moat's direction of his request to Ms. Summers was reasonable considering NFD's practices regarding requests for waivers. Both Ms. Summers and Chief Moreland handled matters regarding employees' requests for waivers. (Moreland Dep. 32-35; Summers Dep. 66-67, 69). Furthermore, Ms. Summers was responsible for stating whether the NFD "supported" requests for waivers; within the last five years, no request for a waiver that was supported by the NFD has been denied. (Collective Ex. 9; Ex. 10, IOD Waiver Spreadsheet). At Mr. Moat's June 9, 2020 hearing, Ms. Summers appeared and stated the NFD did not support his request, and the request was thereafter denied. (Ex. 11, Transcript of Hearing at 5, 29). When Mr. Moat requested light duty, Ms. Summers never told Mr. Moat he should contact someone else to seek an exception to the maximum leave policy – she simply denied his request. (Moat Decl. ¶ 20). At a minimum, Ms. Summers created the appearance she had the authority to approve or deny his request; this creates

a genuine issue of material fact regarding whether it was reasonable for Mr. Moat to direct his request for an accommodation to Ms. Summers, and summary judgment should therefore be denied. *See Jarrus v. Panera, Inc.*, 2020 U.S. Dist. LEXIS 268804, at *10 (E.D. Mich. Aug. 27, 2020) (denying defendant's motion for summary judgment based on defendant's argument that plaintiff's reasonable accommodation claim must fail because plaintiff "failed to follow the established procedure of direct a request for an accommodation to the human resources manager" where, in practice, plaintiff was permitted to request an accommodation from any of his managers).

### c. __Defendant did not reasonably accommodate Mr. Moat by forcing him to go on a disability pension.__

In another footnote, Defendant asserts that Mr. Moat's claim must fail because Mr. Moat did not have a choice between accommodations. In other words, according to Defendant, forcing Mr. Moat to go on a disability pension satisfied its obligations under the ADA.

"Employers are required to provide 'reasonable accommodation' to qualified employees with a disability," and "cannot deny an employee alternative employment opportunities reasonably available under the employer's existing policies." *Kiphart v. Saturn Corp.*, 251 F.3d 573, 586 (6th Cir. 2001). In *Kiphart*, as in this case, the employer "place[d] restricted employees on involuntary medical leave regardless of their ability to continue to perform in temporary positions" and reduced their salary during the involuntary leave pursuant to an internal policy. *Id.* The Court held that a "reasonable jury could . . . determine[] [defendant] failed to reasonably accommodate plaintiff" and that the defendant's "policy of placing restricted employees on involuntary medical leave regardless of their ability to continue to perform in temporary positions was unreasonable." *Id.* at 579 n.7, 587; *see also Jones v. Sharp Mfg. Co. of Am.*, 2016 U.S. Dist. LEXIS 58550, at *27 (W.D. Tenn. May 3, 2016) (denying summary judgment on ADA claim in part because there was a dispute "as to whether Defendant's unilateral decision to 'accommodate' Plaintiff's disability by

sending her home . . . was a reasonable accommodation under the ADA in light of evidence that Defendant may have had positions that Plaintiff could have filled despite her disability"); *Backhaus v. GM, LLC*, 54 F. Supp. 3d 741, 753 (E.D. Mich. 2014) (denying summary judgment because a jury could conclude that defendant's placement of plaintiff on an involuntary, indefinite medical leave where he received "only a fraction of his salary" "was not reasonable").[6]

Under *Kiphart*, summary judgment is inappropriate because a jury could find that Defendant's involuntary placement of Mr. Moat on a pension (which paid only a fraction of his salary) and denial of light duty opportunities was not "reasonable." *Kiphart*, 251 F.3d 579 n.7, 587. This is especially true considering Defendant waived the Maximum Leave Policy for other employees and could typically find light duty positions for employees who needed them. (Moreland Dep. 28; Natali Dep. 25; *infra* Section IV(B)(1)). *See Blanchet*, 27 F.4th at 1230 ("A reasonable jury could find that [plaintiff's] proposed accommodation was reasonable from the fact that [defendant] considered it reasonable.").

### 3. *Failure to Engage in the Interactive Process is a Stand-Alone Claim.*

Respectfully, the great weight of authority in the Sixth Circuit contradicts Defendant's position that failure to engage in the interactive process cannot be a stand-alone claim. The most

---

[6] Courts in other circuits have also found that involuntary medical leaves can be "unreasonable" under the ADA. In *Smith v. DuPage County Sheriff,* the defendants contended that the plaintiffs' reasonable accommodations claims should be dismissed because defendants "accommodated plaintiffs' disabilities by providing paid medical leave, benefits, and preserving plaintiffs' jobs and seniority;" by contrast, plaintiffs asserted their salaries were reduced before they could return to work and that "defendants refused to assign them to vacant light duty jobs." *Smith v. DuPage Cty. Sheriff,* 2017 U.S. Dist. LEXIS 86005, at *10 (N.D. Ill. June 5, 2017). The Court acknowledged that while "the ADA does not entitle a disabled employee to the accommodation of his choice," the "law entitles a qualified person with a disability to a *reasonable* accommodation in view of his limitations and his employer's needs." *Id.* (emphasis in original). The Court held that summary judgment was inappropriate because "there is a factual question as to the [defendant's] response to plaintiffs' requests for light duty assignments and whether suitable light duty assignments were available." *Id.* at *13.

recent Sixth Circuit case analyzing a failure to engage in the interactive process claim explicitly states that a "failure to engage in the interactive process can be an independent violation of the ADA." *Hrdlicka v. GM LLC*, 2023 U.S. App. LEXIS 6973 (6th Cir. March 23, 2023). *See also Vaughn v. Parkwest Med. Ctr.*, 716 Fed. App'x 428, 434 (6th Cir. 2017) (acknowledging that failure to engage in the interactive process can be an independent violation of the ADA where the plaintiff proposed a reasonable accommodation); *Rorrer v. City of Stow*, 743 F.3d 1025, 1041 (6th Cir. 2014) (same); *Mobley v. Miami Valley Hosp.*, 603 Fed. App'x 405, 414 (6th Cir. 2015) (reversing grant of summary judgment on "interactive process claim"); *Boyte v. Shulkin*, 2018 U.S. Dist. LEXIS 15044 at *8-9 (M.D. Tenn. Feb. 14, 2018) ("Failure to engage in the interactive process is an independent ADA violation if the plaintiff establishes a prima facie showing that she proposed a reasonable accommodation . . . or if a reasonable accommodation would have been possible") (Trauger, J.).

As noted in the cases above, a failure to engage in the interactive process is an independent violation of the ADA where the plaintiff proposed a reasonable accommodation; notably, Defendant does *not* assert that Mr. Moat's failure to engage in the interactive process claim fails because he allegedly failed to propose a reasonable accommodation. Rather, Defendant asserts that failure to engage in the interactive process can simply never be a stand-alone claim. This argument fails as a matter of law. Moreover, Plaintiff's proposed accommodations were reasonable for the reasons discussed in Section IV(B)(2).

   **4.      Mr. Moat's disability discrimination claim should not be dismissed.**

Defendant also asserts that Count I of Mr. Moat's disability discrimination claim should be dismissed based on the application of *McDonnell Douglas*.[7] Where a failure to accommodate results in an adverse action, however, that is considered direct evidence of disability discrimination and *McDonnell Douglas* is inapplicable. *See, e.g., Dye v. Thomas More Univ., Inc.*, 2021 U.S. Dist. LEXIS 166894 at *18 (E.D. Ky. Sept. 2, 2021) (denying defendant's motion for summary judgment on both plaintiff's failure to accommodate claim *and* discriminatory discharge claim, noting that "where a failure to accommodate 'leads to a discharge for performance inadequacies resulting from the disabilities,' that is considered direct evidence of an employee's disability, in violation of the ADA.").

To establish an ADA discrimination claim using direct evidence, a plaintiff must show that he: "(1) is disabled, (2) otherwise qualified to perform the essential functions of the position, with or without accommodation, and (3) suffered an adverse employment action because of his or her disability." *Jarrus v. Panera, Inc.*, 2020 U.S. Dist. LEXIS 268804, at *12 (E.D. Mich. Aug. 27, 2020). Mr. Moat can establish all these elements.

First, there is no dispute that Mr. Moat was disabled. Second, as discussed in Section IV(A)(1), he was "otherwise qualified." Third, he suffered an adverse action because of his disability – specifically, reduction of his salary by approximately 50-60%. (Summers Dep. 168; Moat Decl. ¶ 23). Such a significant salary reduction is undoubtedly an adverse action for purposes of the ADA. *See Jarrus* at *15 (for purposes of an ADA claim, an adverse action is "a change in the terms or conditions of [] employment that is more than a mere inconvenience or alteration of job responsibilities, and "[a]n unpaid medical leave is a change of his employment that is more

---

[7] Defendant also argues that Mr. Moat's disability discrimination claim should be dismissed because he was not "otherwise qualified;" for the same reasons discussed in Section IV(A)(1), that argument fails.

than a mere inconvenience or alteration of job responsibilities."); *see also Regen v. Giles Cnty.*, 2016 U.S. Dist. LEXIS 27829, at *19 (M.D. Tenn. March 3, 2016) (for purposes of an ADA claim, "examples of adverse actions may include '. . . a demotion in wage, salary or job title . . .'").

Defendant asserts that Mr. Moat was not subjected to an adverse action because waiver of the maximum leave policy was a "discretionary benefit." Respectfully, Defendant cannot avoid its obligations under the ADA by asserting that *reasonable* accommodations are "discretionary benefits." Allowing Defendant to characterize its obligations under the ADA as "discretionary benefits" to be denied at Defendant's whim would subvert the entire purpose of the ADA. All of of the cases cited by Defendant are distinguishable because none of them hold that providing a reasonable accommodation is a "discretionary benefit" that can be denied. Because Mr. Moat suffered an adverse employment action, Defendant's Motion should be denied.

**B.      Plaintiff's Age Discrimination Claims.**

Mr. Moat also alleges that Defendant violated the ADEA and the THRA when it granted waivers to the maximum leave policy to similarly-situated younger employees and/or allowed similarly-situated younger employees to work light duty positions for longer than six months.

To establish a prima facie case of age discrimination, Mr. Moat must show that: "1) []he was a member of the protected class, 2) []he was subject to an adverse employment action, 3) []he was qualified for the position, and 4) []he was replaced by someone outside the protected class . . . [or] treated differently from similarly situated employees outside the protected class." *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 410 (6th Cir. 2008).[8]  Defendant asserts it is entitled to summary judgment on Mr. Moat's age discrimination claims on a theory that Mr. Moat

---

[8] The standard is the same for both Mr. Moat's ADEA and THRA claims. *Pierson v. Quad/Graphics Printing Corp.*, 749 F.3d 530, 536 (6th Cir. 2014).

cannot establish elements two and four of the *prima facie* case.[9] For the reasons set forth below, there are genuine issues of material fact regarding these issues; therefore, Defendant's motion should be denied.

### 1. There are genuine issues of material fact regarding whether Mr. Moat was treated differently than similarly situated younger employees.

Defendant's assertion that Mr. Moat did not identify similarly situated younger employees who were treated differently is without merit. Defendant asserts that Mr. Moat "failed to name any individual or group of individuals who may be similarly situated," but fails to mention the important fact that the identity of all similarly situated comparators was discovered through the documents produced by Defendant to Mr. Moat.

Discovery established the existence of at least two similarly situated younger employees who were treated more favorably than Mr. Moat: Kendall Murphy ("Mr. Murphy"), age 33, and Michael Lawrence ("Mr. Lawrence"), age 32.[10] (Collective Ex. 9; Ex. 10, IOD Waiver Spreadsheet). Mr. Murphy was a firefighter for the NFD; in January 2021, Defendant granted his request for a *six-month* waiver to the Maximum Leave Policy for his IOD injury. (Collective Ex. 9; Ex. 10, IOD Waiver Spreadsheet; Ex. 14, Staff Report; Ex. 15, January 12, 2021 Meeting Minutes at MG2548). Furthermore, Mr. Murphy's doctor did not provide an "exact" date of recovery in support of his request for a waiver – rather, his doctor "*anticipate[d]*" he would return on July 16, 2021. (Ex. 14, Staff Report). Defendant's Motion fails to address Mr. Murphy. Mr.

---

[9] For the same reasons described in Section IV(A)(4), Mr. Moat suffered an adverse action for purposes of his ADEA and THRA age discrimination claims. *See Schram v. Schwan's Sales Enters.*, 124 Fed. App'x 380, 385 (6th Cir. 2005) (for purposes of an ADEA claim, "[a]n adverse employment action may be established by a '. . . decrease in wage or salary . . . '").

[10] Because Mr. Moat was born in 1968, both Mr. Murphy and Mr. Lawrence are significantly younger than Mr. Moat for purposes of the ADEA and the THRA.

Lawrence was also a firefighter for the NFD. (Ex. 16, Staff Report). He was injured in the line of duty in November 2019 and was granted a waiver of the maximum leave policy at the same hearing where Mr. Moat's request for a waiver was denied. (Ex. 16, Staff Report; Ex. 13, Meeting Minutes). The NFD then kept Mr. Lawrence on same light duty assignment until February 19, 2021 – without seeking "approval" from the Civil Service Commission. (Ex. 17, Defendant's Responses to Third Discovery Requests; Collective Ex. 18, Civil Service Commission Minutes). As with Mr. Murphy, Defendant's Motion fails to address Mr. Lawrence.

In this case, both Mr. Murphy and Mr. Lawrence are similarly situated to Mr. Moat in all relevant aspects. *See Strickland v. City of Detroit*, 995 F.3d 495, 513 (6th Cir. 2021) (an employee in a "different precinct and position" from plaintiff, or employees with "different positions, reporting regulations, and conduct" from plaintiff, can still be similarly situated if those distinctions are not "relevant to the Department's . . . decisions"). In this case, Defendant identified the following factors causing alleged comparators to not be similarly situated to Mr. Moat: (1) not having firefighting duties; (2) having non-IOD impairments, as opposed to IOD impairments; and (3) requesting 1-4 months of light duty. Mr. Moat, Mr. Murphy, and Mr. Lawrence are similarly situated in all the factors identified by Defendant as relevant in this case. First, all three had firefighting duties. (Collective Ex. 9; Ex. 10, IOD Waiver Spreadsheet). Second, all three had IOD impairments. (Collective Ex. 9; Ex. 10, IOD Waiver Spreadsheet). Third, Mr. Murphy sought a six-month leave, just as Mr. Moat did, (Ex. 14, Staff Report; Ex. 15, January 12, 2021 Meeting Minutes at MG2548), and Mr. Lawrence was on leave and/or a light duty assignment from November 20, 2019 until February 19, 2021 – nearly the *exact* length of time that Mr. Moat also sought leave and/or a light duty assignment. (Ex. 16, Staff Report; Ex. 13, Meeting Minutes; Ex.

17, Defendant's Responses to Third Discovery Requests; Ex. 18, Civil Service Commission Minutes).

Based on the foregoing, there is a genuine issue of disputed facts regarding whether similarly situated employees were treated less favorably than Plaintiff, and Defendant's Motion should be denied.

### 2. Dismissal of Mr. Moat's age discrimination claim is not mandated by <u>Pelcha</u>.

Defendant argues that Mr. Moat's age discrimination claim must be dismissed because Mr. Moat cannot assert alternative theories for recovery at the summary judgment stage where one of those theories of recovery is an age discrimination claim. Defendant relies on *Pelcha v. MW Bancorp.*, 988 F.3d 318 (6th Cir. 2021) for the proposition that Mr. Moat is precluded from proceeding on both his age discrimination claim and his disability discrimination claim; however, nothing in *Pelcha* states that a Plaintiff cannot survive summary judgment on both an age discrimination claim and a non-age discrimination claim. Rather, *Pelcha* stands for the proposition that a plaintiff must show that age "had a determinative influence on the outcome of the employer's decision-making process." *Pelcha*, 988 F.3d 318, 324 (6th Cir. 2021) (cleaned up). Furthermore, *Pelcha* is distinguishable from this case because, in *Pelcha*, the Court found that plaintiff did not prove that the defendant's reason for terminating her was pretextual. *Id.* at 326-29. In this case, Mr. Moat need not reach a pretext analysis, because Defendant's Motion fails to address Mr. Murphy and Mr. Lawrence at all and fails to articulate a legitimate, non-discriminatory reason for why Defendant treated Mr. Murphy and Mr. Lawrence more favorably than Mr. Moat. The reasoning of *Pelcha* is therefore inapplicable to Defendant's Motion.

Importantly, post-*Pelcha*, the Sixth Circuit has reversed multiple grants of summary judgment in favor of defendant where the plaintiff alleged age discrimination along with another

theory of discrimination. *See Bledsoe v. TVA Bd. Of Dirs.*, 42 F.4th 568, 574 (6th Cir. 2022) (reversing grant of summary judgment where Plaintiff alleged both age and disability discrimination); *Sloat v. Hewlett-Packard Enter. Co.*, 18 F.4th 204 (6th Cir. 2021) (reversing summary judgment where plaintiff alleged both age and retaliation claims). The Court in both *Bledsoe* and *Sloat* cited *Pelcha*. *See Bledsoe*, 42 F.4th at 581; *Sloat*, 18 F.4th at 209. If *Pelcha* stood for the proposition that a plaintiff cannot defeat a summary judgment motion on both an age and a non-age discrimination claim, surely the Sixth Circuit would have said as much. It did not, and Defendant's argument must fail.

## V.     CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests the Court deny Defendant's Motion for Summary Judgment.

Respectfully submitted,

**JESSE HARBISON LAW, PLLC**

*/s/ Jesse Ford Harbison*

Jesse Ford Harbison, BPR No. 032105
P.O. Box 68251
Nashville, TN 37206
(615) 415-3285
jesse@jesseharbisonlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on May 5, 2023, a true and correct copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt as follows: J. Brooks Fox, Benjamin Puckett, Department of Law, Metropolitan Courthouse, Suite 108, P.O. Box 196300, Nashville, Tennessee 37219. Parties may access this filing through the Court's electronic filing system.

*/s/ Jesse Ford Harbison*

Jesse Ford Harbison