IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| **BRIAN MOAT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:21-cv-00807** |
| | ) | **Judge Aleta A. Trauger** |
| **THE METROPOLITAN** | ) | |
| **GOVERNMENT OF NASHVILLE AND** | ) | |
| **DAVIDSON COUNTY, TENNESSEE,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Before the court is the Motion for Summary Judgment (Doc. No. 17) filed by defendant

Metropolitan Government of Nashville and Davidson County, Tennessee ("Metro), seeking

dismissal of plaintiff Brian Moat's claims of discrimination based on age and disability under state

and federal law. Moat, a former firefighter with the Nashville Fire Department ("NFD"), a division

of Metro, opposes the motion. For the reasons set forth herein, the motion will be granted in part

and denied in part.

## I.    BACKGROUND[1]

### A.    Metro's IOD Program

Metro operates an injury-on-duty ("IOD") program in lieu of providing benefits to Metro

employees under Tennessee's Workers' Compensation Law. (Doc. No. 1-10, First Am. Compl.

("FAC") ¶ 13.) As explained in Section 4.8 of Metro's Civil Service Rules, pertaining to "In Line

---

[1] All facts set forth herein are viewed in the light most favorable to the plaintiff unless
otherwise indicated.

of Duty Injury Leave":

> Injury leave is used when an employee has an on-the-job injury or develops an occupational illness arising from employment with Metro Government. It is intended to provide salary continuation and job security until such time as the employee can return to his regular duties, with or without accommodation, or is determined as disabled from performing the essential duties of his job.

(Doc. No. 23-5, at 2, 6, Rule 4.8(A).)[2] Regarding the duration of IOD leave and benefits, Rule 4.8(D) states that "[l]eave and/or light duty for an injury shall extend for such time as the injured employee is unable to work, but in no event beyond six months of compensation for the same or recurring injury." (*Id.* at 3, 7.) Notwithstanding that limitation, if an employee "requires additional IOD leave," he "may request a waiver from the Civil Service Commission." (*Id.*) In such event:

> The employee shall present medical information confirming that he will be capable of returning to full, unrestricted duty within a specified and reasonable amount of time. The Civil Service Commission may consider if this additional time places an undue hardship on the department. The Metro IOD Clinic physician and/or the Civil Service Medical Examiner may be consulted if necessary. The employee must submit their request prior to exhausting their six months of compensation.
>
> When the Civil Service Medical Examiner determines that the employee is disabled and will not be able to return to work, after full consideration of possible reasonable accommodation, the employee should immediately apply for the appropriate pension. An employee applying for a disability pension is required to notify his Appointing Authority, who will investigate the possibility of accommodating the employee's restrictions before the pension application is processed.

(*Id.* at 3–4, 7–8.)

An employee on IOD leave receives 100% of his regular pay for the first two weeks he is on leave and 90% of his pay thereafter. (*Id.* at 4, 8, Rule 4.8(E).) Injured employees on IOD light duty receive 100% of their regular pay. (*Id.*)

**B.     Brian Moat's Injuries and Course of Treatment**

Plaintiff Brian Moat was born in June 1968 and was fifty-two years old in June 2020. He

---

[2] The plaintiff filed copies of the Rules in effect as of July 9, 2019 and July 14, 2020. At least with respect to Rule 4.8, there does not seem to be any difference between the two versions.

was at all relevant times employed by the NFD as both a firefighter and paramedic.[3]

On December 12, 2019, Moat injured his lower back in the line of duty, and his injury resulted in physical impairments that substantially limited one or more of his major life activities. He underwent lumbar surgery to address the injury in December 2019 and, because he was temporarily unable to work, received IOD leave and benefits from December 13, 2019 through June 22, 2020.

Moat's treating physician for his on-the-job back injury was Dr. Oran Aaronson. Dr. Aaronson's treatment notes for appointments on January 30, April 21, June 18, August 18, and November 24, 2020 document steady and regular improvement over time. (*See* Doc. No. 23-4, Medical Records, at 40, 42, 31, 33, 25, 27, 17, 19, 13, 15; *see also* IOD Reports, Doc. No. 29-12.) As of April 21, 2020, just four months post-surgery, however, Dr. Aaronson noted that Moat was "participating in intensive physical therapy" and "gaining some function." (Doc. No. 23-4, at 31, 33.) At that point, Moat continued to have pain upon sitting, neuropathic pain in his lower left extremities, and spasm at night. He walked with a foot drop (for which he wore an orthotic), and his strength was "some better than previously." (*Id.* at 33.) Dr. Aaronson assessed the plaintiff as continuing to need "intensive physical therapy" and to "stay off work" completely until his follow-up appointment, in four months, as even prolonged sitting for a desk job would "impede his healing." (*Id.*) At the same time, Dr. Aaronson "remain[ed] optimistic" that Moat would be able return to work as a fireman "12 months after his surgery." (*Id.*)

---

[3] The facts for which no citation is provided are either undisputed background facts or are conceded in the plaintiff's Response to the defendant's Statement of Undisputed Material Facts (Doc. No. 27).

On May 17, 2020, Dr. Aaronson provided a letter addressed "To Whom It May Concern" regarding Moat's work status. Consistent with his April 21 treatment note, he stated that Moat still had a left-sided footdrop and needed to stay off work to participate in "vigorous physical therapy" and that he "hope[d]" that Moat would be able to return to work by December 20, 2020, twelve months after his surgery. (Doc. No. 23-4, at 59.)

On Moat's June 18, 2020 visit, however, Dr. Aaronson found his patient to have made significant improvement since his appointment in April. (Doc. No. 23-4, at 25, 27.) On that date, Dr. Aaronson "release[ed] [Moat] back to work tomorrow to light duty" and was "optimistic"— apparently unrealistically—that he could be released back to full duty by September 15, 2020. (*Id.* at 27.) He recommended that Moat avoid repetitive bending, lifting, twisting, running or jumping. (*Id.*; *see also* Doc. No. 29-12, at 10, June 18, 2020 IOD Report.)

The encounter note for August 18, 2020 indicated that Moat was showing "significant improvement" and was "about 70% better," and Dr. Aaronson was "optimistic" that Moat would continue to make a good recovery. (*Id.* at 17, 19.) The plan then was to "keep[] him on light duty with recommendation to avoid repetitive bending, lifting, twisting, running or jumping." (*Id.*)

By late August 2020, Moat was having foot and ankle issues in addition to the lower back problem. (*See* Doc. No. 16-9, at 3.) He was treated on September 8, 2020 by Dr. Rebecca Smith for a painful callus on his left foot as well as swelling in the left ankle, for which he was prescribed crutches and limited to light duty, sitting 75% of the time. (Doc. No. 16-9, at 4–8.) A follow-up IOD report signed by a Dr. Gallagher two weeks later indicated that Moat had a left posterior tibial tendon injury and (inexplicably) was "unable to work" but able to return to "full unrestricted PT." (Doc. No. 29-12, at 13.) The court's record does not contain additional information about the ankle and foot problems.

With regard to Moat's recovery from his lumbar surgery, as of November 24, 2020, Dr. Aaronson noted "impressive improvement now, probably 80% better than prior." (Doc. No. 23-4, at 13, 15.) In Dr. Aaronson's assessment, Moat was making a "steady recovery," and the doctor's plan was to refer him to physical therapy "with work hardening, with a goal to release him back [to work] hopefully in about 3 months' time." (*Id.* at 15.)

Aside from the ankle and back issues, the plaintiff also had hernias that he claims were not bothering him, but Dr. Aaronson noticed them at the November appointment and directed Moat to receive treatment. (Doc. No. 16-3, Moat Dep. 47.) Medical records from Dr. Susan Maurer indicate that the plaintiff saw a Dr. Laneve on November 30, 2020, who diagnosed him with bilateral hernias. Dr. Laneve referred Moat to Dr. Mauer for repair by laparoscopic surgery. (Doc. No. 23-20, at 3.) Moat underwent surgery on January 25, 2021 and was released to return to work by Dr. Maurer as of March 8, 2021. (Doc. No. 16-9, at 14, 19.)

Dr. Aaronson assessed Moat as having reached maximum medical improvement and released him back to work as a firefighter, with no restrictions, on March 10, 2021. (Doc. No. 23-4, at 9.) The plaintiff claimed that Dr. Aaronson would have returned him to work in January, but delayed only because the doctor treating his hernia did not return him to work until March 8, 2021 "on a separate IOD claim for the hernia." (Doc. No. 16-3, Moat Dep. 47.)

The plaintiff testified that he "passed the fit test" and was ready to return to work shortly after that, "sometime around April," but it was July 1, 2021 before the NFD rehired him full time.[4] (Doc. No. 16-3, Moat Dep. 48.) The record indicates that, on May 4, 2021, the Metropolitan Benefits Board approved Moat's return to work but noted as of June 3, 2021 that his anticipated

---

[4] The plaintiff testified that, after his reinstatement, he worked for "about a month" before retiring. (Doc. No. 16-3, Moat Dep. 8.)

return to work date was July 1, 2021. (Doc. No. 23-19.)

### C. Moat's Requests to Extend IOD Benefits and to Work Light Duty

Meanwhile, Moat was on IOD leave from December 13, 2019, when he injured his back, through June 22, 2020, when his six months of IOD leave expired. (Doc. No. 17-1, Summers Decl. ¶ 19.) On April 21, 2020, just after his April appointment with Dr. Aaronson, Moat submitted a request to the Metro Civil Service Commission ("Commission") that his "IOD time" be extended an additional six months, until December 22, 2020, under Rule 4.8(D), "to allow [him] enough time to return to unrestricted work." (Doc. No. 16-1, at 75.) His request, among others, was taken up on June 9, 2020 at the Commission's monthly meeting. Jamie Summers, NFD's Human Resources Manager (Doc. No. 17-1, Summers Decl. ¶ 2), testified at that meeting that the NFD did not support Moat's request, because his case manager's case notes indicated a "12 to 18 month recovery," and Summers was "fearful that come December he will not be . . . ready to return to work and will have to seek a pension" (Doc. No. 23-11, June 9, 2020 Civil Serv. Hr'g Tr., at 5). The NFD instead recommended that Moat seek a disability pension and, when he was fully recovered, reinstatement "through the disability process." (*Id.*)

Moat testified on his own behalf at the meeting that he understood Summers' concerns and recognized that a "nerve injury" is "a little different than healing from a skeletal muscle" injury. (*Id.* at 8.) He also noted that his last evaluation by his doctor had been in April but he had made considerable progress since then, and that, as set forth in the "To Whom It May Concern Letter," his doctor was "highly optimistic" that he could return to work by December 2020. (*Id.* at 6, 8.) He expressed his strong desire to return to work and "finish [his] career on a high note." (*Id.* at 8.) He stated that he was still doing "aggressive physical therapy and home training and home conditioning" and planned to be able to work without restrictions by December. (*Id.* at 8–9.) He believed that he could probably do his job already, as of the date of the meeting, but he did not

think it would be safe for his co-workers or patients for him to do so. (*Id.* at 8.) He understood that there was "no guarantee" that he would be ready by December. (*Id.* at 9.)

Summers responded that her understanding of Dr. Aaronson's report was simply that he "hoped" that Moat would be able to return to work unrestricted by December 2020, not that he was "confident" that he would be able to do so. (*Id.* at 9–10.) She also noted, apparently incorrectly, that the NFD had only had one prior request for a six-month extension of IOD leave. (Doc. No. 16-1, Summers Dep. 130; Doc. No. 23-11, at 10.) She also pointed out that the purpose of the disability pension, for which Moat would be eligible, was "for people to take that time to go heal themselves and get better. And then he can return to work and finish his career." (Doc. No. 23-11, at 10.) She also noted that, at that point, he had not even been released to return to light duty work and that the doctor's note from April indicated relatively minimal improvement. (*Id.*) Moat countered that he would "gladly" get a medical reevaluation and that he believed his doctor would be willing to return him to light duty. (*Id.* at 11.) He was "very agreeable" to an "extension long enough to get an appointment with [his] neurologist and have him assign [him] back to light duty." (*Id.*)

In response to a question from one of the Commissioners about whether they could extend IOD for thirty days and then get an update at the subsequent meeting, Summers explained that her understanding of the rule was that "you get one bite at the apple," because a request for an extension of IOD leave had to be made and approved before the original leave period expired. (*Id.* at 13.) Shannon Hall, one of the Staff Members of the Civil Service Commission, confirmed that Summers' understanding of the rule was correct. (*Id.* at 2, 13.) After some discussion among the Commission members, however, another staff member, Nicki Eke, stated that the Commission had the discretion to "grant IOD up to the next meeting" and then make a final decision at that meeting

regarding whether to extend it beyond" that time. (*Id.* at 18.) Moat reiterated his belief that he was healing quickly at that point and would be capable of performing light duty work, so it was "just a matter of me getting into position now and saying, Okay, I need to be reevaluated so I can be put on light duty." (*Id.* at 15.) Following additional discussion about how the pension and reinstatement process worked and considering all their options, the Commission members voted unanimously to deny Moat's request for an extension of his IOD, with the understanding that he would be eligible for a disability pension and also would be entitled to reinstatement as a fireman once he was fully recovered. (*Id.* at 28–29.)

Moat had a follow-up appointment with Dr. Aaronson just nine days later, on June 18, 2020. Moat emailed Summers after the appointment, notifying her that the doctor had returned him to light duty effective June 19, 2020 and requesting that he be placed on light duty until his reevaluation in August. (Doc. No. 16-1, at 81.) Summers responded that, "[p]er Civil Service Rules your IOD and IOD light duty run concurrently, you only have six months total for your IOD." (Doc. No. 16-1, at 80.) Because his IOD leave was set to expire on June 22, 2020 (not having been extended by the Commission), he was "not eligible for light duty." (*Id.*) She added: "Please make sure you . . . follow any HR mandated pension requirements and we will get you back to work as soon as you are released through the return to work process." (*Id.*) Asked about this exchange during her deposition, Summers explained that, when Moat emailed her, all he sent to her was the "201 form" showing that Dr. Aaronson had checked a box for light duty. (*See* Doc. No. 16-1, Summers Dep. 146 (referring to Doc. No. 16-1, at 80, Moat's June 18, 2020 email referencing "201 dated 6-18-20"); *see also* Doc. No. 292, at 8, June 18, 2020 Form 201.) According to Summers, because the form contained very little information—not even indicating whether the plaintiff had actually had an appointment with Dr. Aaronson—and was not signed by the plaintiff,

she had no way to "verify" it. (Summers Dep. 145.) She disputed the suggestion that she "denied" Moat's request for light duty; instead, in her view, she simply informed him that it "wasn't available, per the rule." (*Id.* at 147.) She did not recall reaching out to discuss the matter with anyone else before sending her email response. (*Id.* at 157.) She also did not request more information from Moat or ask him whether he had actually seen Dr. Aaronson.

Following the denial of his requests to extend IOD, Moat timely applied for his disability pension, which went into effect on August 1, 2020, following the expiration of his IOD leave and accrued vacation leave. (Doc. No. 17-1, Summers Decl. ¶ 19; Doc. No. 16-1, at 80.) He remained on disability pension until his full reinstatement on July 1, 2021. It is undisputed that he received approximately ninety percent of his salary while on IOD leave and approximately fifty percent of his salary while on disability pension.

### D.    Alleged "Comparators"

After making his verbal request to the Commission on June 9, 2020 to extend his IOD until he saw his doctor again, which the Commission rejected, the plaintiff did not renew his request to the Commission for a waiver of the IOD rules. Instead, he emailed Jamie Summers, who, as set forth above, told him his IOD period, for leave or for light duty, expired on June 22, 2020 and had not been extended by the Civil Service Commission. The defendant asserts that, if the plaintiff sought to work light duty, his request would have to be approved by the Civil Service Commission. (*See* Doc. No. 16-1, Summers Dep. 64–65 ("Q. Okay, and that means that if someone has an injury and they are off duty and they need light duty, and when you add those two periods of time together it exceeds six months, they can't do that unless the Civil Service Commission approves it; correct? A. For an in line of duty injury, correct.").) It also asserts that NFD employees were not authorized to give the plaintiff light-duty work beyond the expiration of the six-month IOD period. (*Id.*)

The plaintiff disputes the NFD's assertion that light duty requests following expiration of IOD had to be approved by the Commission and that NFD employees were not authorized to place employees whose IOD had already expired on light duty, pointing out that Summers denied his request without referring him to the Commission. He also asserts that the NFD "authorized" other employees with IOD injuries to extend their IOD and/or to remain on light duty assignments beyond the periods approved as a "waiver" by the Commission. He points to firefighters Michael Lawrence (age 32) and Kendall Murphy (age 33) as examples.

Regarding Lawrence, the June 9, 2020 Metro Civil Service Commission Meeting Minutes reflect that, at the same meeting at which it denied Moat's request to extend his IOD time under Rule 4.8(D) for an additional six months, the Commission approved Lawrence's request to "extend his IOD time" under Rule 4.8(D), until August 10, 2020. (Doc. No. 23-13, at 1, 8.) The Staff Report submitted to the Commission regarding Lawrence's request indicates that Lawrence was injured in the line of duty on November 20, 2019. (Doc. No. 23-16.) He suffered severe burns to both hands and his right thigh and an orthopedic injury to his right wrist. Due to the severity of the burns, he was unable to have his wrist examined until two months after the injury. (*Id.*) He was placed on light duty while he completed occupational therapy and underwent surgery on May 20, 2020. His IOD time on light duty was due to expire on July 8, 2020, but "[h]is physician provided documentation indicating that he expects Mr. Lawrence will be able to return to full duty by August 10, 2020." (*Id.*) In other words, the Commission approved his request to extend his IOD time on light duty for one month. According to the defendant, Lawrence was released to return to work without restrictions on August 10, 2020. (Doc. No. 23-17 at 3.)

As the defendant explained further in an interrogatory answer, Captain Lanius requested through his Chain of Command that, when Lawrence's IOD duty time expired and he was returned

to work without restrictions, Lawrence be "assigned to him temporarily to finish a time sensitive project." (Doc. No. 23-17, at 3.) Captain Lanius "specifically requested Mr. Lawrence because he had already begun the project while he was on IOD/Light Duty and his assistance was required to complete the project." (*Id.*) Contrary to the plaintiff's suggestion, there is no evidence that Lawrence sought (or needed) an extension of his light-duty assignment from the NFD or the Commission or that the NFD or the Commission granted any such request. Nor is there any indication that Lawrence's temporary assignment, following his return to work without restrictions, was considered light-duty work, regardless of the level of exertion actually required to complete the assigned task. (*See id.* (describing assigned tasks as requiring manual labor).)

Kendall Murphy was injured while on duty as a firefighter on February 21, 2018. As explained in the Staff Report to the Commission prior to its January 2021 meeting, Murphy had undergone back surgery ten months later, on December 2018, but had returned to full duty in April 2019. Almost two years after his first surgery and more than eighteen months after his return to duty without restrictions, it was determined that he needed a second surgery related to the February 2018 injury, which was scheduled for January 15, 2021. His doctor "anticipated" that he would be able to return to full duty on July 16, 2021. (Doc. No. 23-14.) At that time, due to his having taken IOD leave in 2019 related to his first surgery, the NFD estimated that he only had "about 10 days of IOD leave time remaining." (*Id.*) Murphy requested an additional six months of IOD leave, from January 15 to July 16, 2021, to complete his recovery following the second surgery. (*Id.*) The minutes for the Commission's January 12, 2021 meeting reflect that this request was granted. (Doc. No. 23-15, at 6.) There are no other facts in the record regarding Kendall Murphy's situation.

### E. The Plaintiff Pursues an EEOC Claim and Files Suit Against Metro

The plaintiff filed his original EEOC Charge of Discrimination with the Tennessee Human Rights Commission on September 17, 2020. (Doc. No. 16-4.) He alleged discrimination on the

as)basis of age and disability based on the NFD's failure to support his request for a waiver, which resulted in the Civil Service Commission's denial of a request for a waiver to extend his IOD by six months, despite his doctor's opinion that he would be able to return to unrestricted work within six months. He also alleged that the Commission "routinely" grants "extensions of IOD leave for younger employees" and that younger employees are "routinely placed on alternate duty after injuries for extended periods of time." (*Id.* at 1.) Moat filed an amended Charge on March 19, 2021, which, in addition to the original allegations, included new claims that the NFD had violated the Americans with Disabilities Act when it failed to accommodate his disability and failed to engage in the interactive process, based on Jamie Summers' refusal to consider Moat's June 18, 2020 request to be assigned to work light duty. (Doc. No. 16-5, at 3.)

Moat filed suit against Metro in the Chancery Court for Davidson County, Tennessee, on June 8, 2021, asserting state law claims for violation of the Tennessee Disability Act ("TDA") and the Tennessee Human Rights Act ("THRA"). (Doc. No. 1-1.) He filed the FAC in September 2021, which amended his original pleading to assert federal claims for violation of the Americans with Disabilities Act ("ADA") and the Age Discrimination in Employment Act ("ADEA"), in addition to his state law claims. Metro promptly removed the case to federal court on the basis of federal question jurisdiction.

### F. The Summary Judgment Motion

Metro has now moved for summary judgment. In support of its motion, it filed a Memorandum of Law (Doc. No. 18), Statement of Undisputed Material Facts (Doc. No. 19), and a substantial quantity of evidentiary material, as referenced above. The plaintiff filed a Response to the motion (Doc. No. 22), Response to the Statement of Undisputed Material Facts (Doc. No. 21), his own Statement of Additional Facts (Doc. No. 24), and his own evidentiary material. The defendant filed a Reply (Doc. No. 27), as well as a Response to the plaintiff's Statement of

Additional Facts (Doc. No. 28).

## II.     LEGAL STANDARD

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying and citing specific portions of the record—including, *inter alia*, depositions, documents, affidavits, or declarations—that it believes demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018); Fed. R. Civ. P. 56(c)(1)(A). If the non-moving party asserts that a fact is genuinely disputed, it generally "must support the assertion by . . . citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Pittman*, 901 F.3d at 628 ("The nonmoving party 'must set forth specific facts showing that there is a genuine issue for trial.'" (quoting *Anderson*, 477 U.S. at 250)). The

court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and the weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018).

## III.  ANALYSIS

The FAC incorporates four claims for relief, or "counts": (1) disability discrimination in violation of the ADA and TDA; (2) failure to accommodate a disability in violation of the ADA; (3) failure to engage in the interactive process as required by the ADA; and (4) age discrimination in violation of the ADEA and THRA. The defendant seeks summary judgment on each count.

### A.  Age Discrimination Claims

In Count IV, Moat alleges that the denial of his requests to extend his IOD leave from June to December 2020 and to be assigned to "temporary" light-duty work—and the resulting reduction in his salary—constitute age discrimination under the ADEA and the THRA. (FAC ¶ 64.) The defendant moves for summary judgment on the age discrimination claims, asserting that the plaintiff cannot claim that the adverse employment actions were the result of *both* age discrimination *and* disability discrimination under a "multiple motivations" theory. The defendant also argues that the plaintiff lacks direct evidence of age discrimination and lacks evidence to support a *prima facie* case of age discrimination using indirect evidence.

#### 1.  *"But for" Causation*

The ADEA and the THRA make it unlawful to discriminate against an employee based on his age. 29 U.S.C. § 623(a)(1); Tenn. Code Ann. § 4-21-101 *et seq.* Age discrimination claims under the THRA are assessed "using the same analysis as those brought under the ADEA." *Pierson v. Quad/Graphics Printing Corp.*, 749 F.3d 530, 536 (6th Cir. 2014) (citation omitted). The court's analysis of the ADEA claim is therefore also dispositive of the THRA claim.

The ADEA prohibits employers from terminating employees "because of such individual's

age." 29 U.S.C. § 623(a)(1). The Supreme Court has explained that this "because of" language means that a plaintiff must "prove by a preponderance of the evidence (which may be direct or circumstantial) that age was the 'but-for' cause of the challenged employer decision." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78 (2009). "Under *Gross*, satisfying but-for cause requires plaintiffs to show that age 'had a determinative influence on the outcome' of the employer's decision-making process." *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021) (quoting *Gross*, 557 U.S. at 176).

Citing *Pelcha*, the defendant argues that the "mixed motive" theory of recovery applicable to actions under Title VII[5] does not apply to ADEA claims and that, because the plaintiff purports to have direct evidence of disability discrimination, he cannot also pursue his age discrimination claims. The defendant, however, appears to be confusing "but-for" causation with the "sole cause" standard that applies to claims brought under § 504 of the Rehabilitation Act. *See* 29 U.S.C. § 794(a) ("No otherwise qualified individual with a disability in the United States . . . shall, *solely by reason of her or his disability*, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."). The Sixth Circuit has stated that the "sole-cause standard in the end is a creature of the Rehabilitation Act, and that is where we should leave it." *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 317 (6th Cir. 2012).

---

[5] Although Title VII also incorporates "because of" language pertaining to causation, it was amended to specify that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a *motivating factor* for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m) (emphasis added); *see Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1739 (2020) (noting that Congress "supplement[ed] Title VII in 1991 to allow a plaintiff to prevail merely by showing that a protected trait like sex was a 'motivating factor' in a defendant's challenged employment practice.").

*Pelcha* admittedly contains some confusing language.[6] Insofar as *Pelcha* might be construed as interpreting "but for" causation to be equivalent to "sole cause," the court declines to adopt such a reading, as *Pelcha* did not squarely reach that conclusion, and, if it had, it would appear to be inconsistent with Sixth Circuit opinions both preceding and following *Pelcha*. *See, e.g.*, *Bledsoe v. TVA Bd. of Dirs.*, 42 F.4th 568, 580 (6th Cir. 2022) (post-*Pelcha*, distinguishing between sole-cause and but-for causation standards, and holding that "§ 504's sole-cause standard does not apply to claims brought under § 501" of the Rehabilitation Act, which, instead, are subject to the same but-for causation standard that applies to claims under the ADA and ADEA, and allowing a disability discrimination claim under § 501 of the Rehabilitation Act and an age discrimination claim under the ADEA to survive summary judgment); *Lewis*, 681 F.3d at 314–19 (distinguishing between "solely by reason of" causation, as required by § 504 of the Rehabilitation Act, "because of" or but-for causation required by the ADA and ADEA, and "motivating factor" causation applicable to Title VII claims, and concluding: "Just as we erred by reading the 'solely' language from [§ 504 of] the Rehabilitation Act into the ADA . . . , so we would err by reading the 'motivating factor' language from Title VII into the ADA.").

Moreover, although the plaintiff claims to have direct evidence of disability discrimination, the jury could reject his ADA claims and, theoretically at least, conclude that any adverse actions were premised upon age discrimination instead. The court finds, in sum, that the "but-for" causation standard does not mean that the plaintiff, at the summary judgment stage, at least under

---

[6] The plaintiff in *Pelcha* argued that the Supreme Court's decision in *Bostock*, requiring that the plaintiff prove only that "plaintiffs need not prove that sex was the only cause of termination," changed the interpretation of the "because of" language used in Title VII as well as the ADEA. *Pelcha*, 988 F.3d at 324 (citing *Bostock*, 140 S. Ct. at 1739). The Sixth Circuit rejected that argument, noting the narrow scope of *Bostock*, and implied that there could never be more than one "but for" cause in the ADEA context. *Id.* at 323–24 (citing *Gross*, 557 U.S. at 176).

the facts presented here, must decide between his ADEA and ADA claims.

### 2.    *The Plaintiff's* Prima Facie *Case of Age Discrimination Fails*

Plaintiffs may show a violation of the ADEA through either direct or circumstantial evidence. *Pelcha*, 988 F.3d at 324 (citation omitted). The plaintiff here does not claim to have direct evidence of age discrimination. Claims based on circumstantial evidence are considered under the familiar three-step burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–06 (1973). Under *McDonnell Douglas*, the plaintiff must first establish a *prima facie* case of discrimination. *Pelcha*, 988 F.3d at 325. If the plaintiff succeeds at that step, the burden of production shifts to the employer to identify a legitimate, nondiscriminatory reason for the termination. Once the employer identifies a reason, the burden shifts back to the plaintiff to prove the employer's reason is a mere pretext. If the plaintiff prevails at this step, the factfinder may reasonably infer discrimination. *Id.*

To establish a *prima facie* case of age discrimination, the plaintiff must show that: (1) he was older than 40 years old; (2) he suffered an adverse employment action; (3) he was qualified for the position held; and (4) he was either replaced by someone outside of the protected class[7] or similarly situated non-protected employees were treated more favorably. *Id.* at 326 (citation omitted). Metro argues that the plaintiff cannot show that he suffered an adverse employment action or that similarly situated non-protected employees were treated more favorably. The court finds that, irrespective of whether the denial of the plaintiff's request to extend his IOD or authorize him to work light duty constitutes an adverse employment action for purposes of his age discrimination claim, Moat has not shown that similarly situated non-protected employees were treated more favorably than he was.

---

[7] The plaintiff does not claim to have been terminated or replaced.

"To sufficiently demonstrate similarly situated employees, plaintiffs must show that the proffered 'comparables' are similar in all respects." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 727 (6th Cir. 2016) (quotation marks and citation omitted). The Sixth Circuit has "disapproved of a rigid standard," *Jackson v. FedEx Corp. Servs., Inc.*, 518 F.3d 388, 394 (6th Cir. 2008), and held that the plaintiff must show that "all of the *relevant* aspects of his employment situation were 'nearly identical' to those of the [comparable employee's] employment situation.'" *O'Donnell*, 838 F.3d at 727 (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)) (emphasis added); *see also Tschappatt v. Crescent Metal Prods., Inc.*, 798 F. App'x 887, 889 (6th Cir. 2020) ("To be meaningful, the comparison must be between employees 'similarly situated' to the plaintiff in all relevant respects." (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).

In this case, the plaintiff seeks to compare himself to Michael Lawrence and Kendall Murphy. He asserts that he is similar to Lawrence and Murphy insofar as these proposed comparators, like him, had firefighting duties and IOD impairments, and they requested extensions of IOD leave after having already taken approximately six months of IOD leave or light duty. Even viewing the facts in the record in the light most favorable to the plaintiff, the court finds that the plaintiff cannot show that the proposed comparators are similarly situated in all *relevant* respects.[8]

---

[8] The defendant argues in support of summary judgment that the plaintiff cannot show that he is similarly situated to twelve other employees the defendant identifies and distinguishes. The plaintiff does not contend that he is similar to any of the employees identified by the defendant, instead relying solely on his purported similarities with Lawrence and Murphy. The defendant's Reply does not expressly address whether Lawrence and Murphy are similarly situated but argues very generally that the plaintiff has not identified any comparators who are similarly situated in all relevant respects and that the differences between the plaintiff and his proposed comparators also function as a legitimate, nondiscriminatory reasons for the difference in the treatment of his request to extend his leave.

Regarding Lawrence, Moat argues that Lawrence's request for an extension of his IOD time was granted at the same time that the plaintiff's was denied and that Lawrence was allowed to stay on light duty for an additional six months after he was reinstated, without seeking approval from the Commission. However, Lawrence requested only a one-month extension of his IOD while he was already working light duty, rather than on leave. In contrast, the plaintiff requested an additional six months of leave while he was on leave. As of the time of his initial request for light duty during the Commission meeting, Dr. Aaronson had not yet released Moat to work light duty. In addition, Lawrence suffered burns and an orthopedic injury, but there is no suggestion that he had had back surgery or the same type of nerve damage as the plaintiff, which the plaintiff himself acknowledged heals differently than other types of injuries. (Doc. No. 23-11, at 8.) Lawrence's doctor provided documentation "indicating that he expect[ed] Mr. Lawrence will be able to return to full duty by August 10, 2020"—just over a month after his IOD otherwise expired. (Doc. No. 23-16.) The treatment notes from the plaintiff's most recent doctor's appointment expressed, at best, guarded optimism as to Moat's prospects for recovery over the course of the next eight months. In other words, in the areas of comparison that appear to be most relevant here, including the type of injury, prognosis for recovery, work status, and length of the IOD extension requested, Lawrence and Moat are not remotely similar.

As for the plaintiff's assertion that Lawrence was allowed to extend his light-duty assignment without seeking a waiver from the Commission, the defendant asserts—and the plaintiff does not refute—that Lawrence was returned to full duty, without restrictions, on August 10, 2020, as predicted by his doctor. (Doc. No. 23-17, at 3.) Moat presents no evidence to support his assertion that Lawrence stayed on light-duty status after he was released to work without restrictions. The defendant explains that Lawrence was assigned, at his supervisor's request, to

complete a time-sensitive project that he had started while he was on light duty but that the assignment was not considered light duty. (*See id.*) The plaintiff's speculation notwithstanding, there is no evidence in the record from which a reasonable jury could conclude that Lawrence needed—or requested—an extension of his assignment to light duty, and no basis for comparing his situation to that of Moat.

The plaintiff's attempt to compare himself to Kendall Murphy also fails. Murphy had already been out on IOD leave for approximately five months and twenty days, successfully returned to work following his surgery in 2019, and continued working without restrictions for more than a year and a half before discovering that he needed additional surgery in connection with the original injury. The Commission granted him an additional six months to recover from the second surgery. There is no suggestion regarding what happened when that six months expired and, more to the point, no basis for concluding that Murphy and Moat were similarly situated in any relevant respects, in particular because Murphy had already successfully returned to work after his first surgery, and the record does not suggest that recovery from his second procedure was anticipated to be complicated or slow. Again, there is simply no evidence that Murphy and Moat were similarly situated in terms of type of injury, prognosis, or work status at the time of requesting additional leave. And, although Murphy was requesting a six-month extension of his leave, it was based on his having the second surgery more than two years after the first.

Because the plaintiff has not identified younger comparators who were similarly situated to him in all *relevant* aspects, he cannot prove a *prima facie* case of age discrimination. The defendant is entitled to summary judgment on the plaintiff's age discrimination claims under the ADEA and THRA.

### B. ADA – Failure to Accommodate a Disability

The ADA prohibits discrimination against a qualified individual based on disability. 42

U.S.C. § 12112(a). Prohibited discrimination includes "not making reasonable accommodations." *Id.* § 12112(b)(5)(A). Employees can generally prove ADA discrimination using either direct or indirect evidence, and "each has its own test." *Blanchet v. Charter Commc'ns, LLC*, 27 F.4th 1221, 1227 (6th Cir. 2022) (citations omitted). However, because failure to accommodate a disability is "expressly listed in the Act's definition of disability discrimination," *id.* (citing 42 U.S.C. § 12112(b)(5)(A)), "claims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence (the failure to accommodate) of discrimination," *id.* (quoting *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007)). Accordingly, courts apply the direct evidence test to failure-to-accommodate claims. *Id.*

Under the direct evidence test, the plaintiff bears the initial burden of establishing that (1) he is disabled, and (2) he is "otherwise qualified" for the position despite the disability, "(a) without accommodation from the employer; (b) with an alleged 'essential' job requirement eliminated; or (c) with a proposed reasonable accommodation." *Id.* at 1228 (quoting *Kleiber*, 485 F.3d at 869). The ADA requires employers to "mak[e] reasonable accommodations." 42 U.S.C. § 12112(b)(5)(A). A plaintiff who requires an accommodation bears the burden of proposing an accommodation and showing that it "seems reasonable on its face." *Blanchet*, 27 F.4th at 1229 (quoting *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002)). Determining the reasonableness of a proposed accommodation is generally a question of fact. *Id.* at 1229–30 (citing *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 634 (6th Cir. 1998)). Once the plaintiff proposes a facially reasonable accommodation, the burden shifts to the employer to show that accommodating the plaintiff would impose an "undue hardship" on the employer or that the accommodation would eliminate an essential job requirement. *Id.* at 1230.

In this case, Moat alleges that he was otherwise qualified for his position with the NFD with a proposed reasonable accommodation and that Metro failed to accommodate him when (1) the Commission denied his request to extend his IOD leave an additional six months or, alternatively, to be put on light duty; and (2) Jamie Summers denied his request to be placed on light duty after his doctor released him to work light duty. The defendant argues that his claim fails because he cannot show that either requested accommodation—extended leave or being placed on light duty—would have allowed him to perform the essential functions of his job as a firefighter and, therefore, that he was not "otherwise qualified" for his position, and the proposed accommodations were *ipso facto* unreasonable. It bolsters its arguments by pointing out that the plaintiff had additional foot and ankle issues in the fall of 2020 and then hernia surgery in December 2021, as a result of which his doctors kept him off work until March 2021. In footnotes, and again in its Reply, the defendant further argues that the plaintiff's doctor's note expressing only "hope" that he could return to work in six months was not sufficiently definite, that Moat cannot show that he submitted a request for light duty to the Commission, which was the only body that had the authority to grant the request, that he was not entitled to his requested accommodation, and that, under Metro's Civil Service Rules, his disability was reasonably accommodated when he was granted more than a year of paid leave under Metro's IOD program, first at approximately ninety percent of his regular pay and then at approximately fifty percent.[9]

---

[9] The court typically will not consider arguments asserted only in footnotes, and such arguments are often deemed to be waived. *See, e.g.*, *In re: Asbestos Prod. Liab. Litig. (No. VI)*, 873 F.3d 232, 237 (3d Cir. 2017) ("[A]rguments raised in passing (such as, in a footnote), but not squarely argued, are considered waived[.]" (citation omitted)), *aff'd but criticized on other grounds sub nom. Air & Liquid Sys. Corp. v. DeVries*, 139 S. Ct. 986 (2019); *United States v. Svoboda*, 347 F.3d 471, 480 (2d Cir. 2003) ("It is well-established . . . that [w]e do not consider an argument mentioned only in a footnote to be adequately raised or preserved for appellate review." (internal quotation marks omitted)). In this instance, however, the plaintiff's Response addresses the defendant's footnoted arguments, and the defendant addresses them again in its Reply (albeit

1.    *Whether Moat Was "Otherwise Qualified"*

In *Blanchet v. Charter Communications, LLC*, the plaintiff took approximately two months of leave after giving birth, using her employer's "standard" maternity leave, short-term disability, and FMLA leave. 27 F.4th at 1225. When that time expired, she requested and was granted approximately five months of additional leave as an accommodation for the postpartum depression she had developed after giving birth. At that point, a breakdown in communications between the third-party administrator (with which the plaintiff was directed to communicate) and the employer occurred: the third-party administrator assured the plaintiff verbally that her request for an additional two months of leave would be granted, but the plaintiff received a termination letter from the employer while her request for leave was technically pending formal approval.

The plaintiff brought suit under the ADA, and the district court granted summary judgment to the defendant. On appeal, as relevant here, the defendant argued that an employee's qualifications for her job must be determined at the time of termination (or denial of accommodation). Its position was that, because the plaintiff "could not perform any of her essential job functions as of the date of her termination, including attending work" (because she had not been medically released to return to work), she was not "otherwise qualified" to perform her job, for purposes of her failure-to-accommodate claim. *Id.* at 1229. The Sixth Circuit disagreed, noting that,

> [w]hen an employee's proposed accommodation is medical leave, examining her qualifications on the date of her termination does not indicate whether she is otherwise qualified with an accommodation. Employees requesting medical leave often cannot perform their jobs when they request leave, and medical leave allows them time to recover from illnesses or medical procedures. To accept [the defendant's] supposed rule, an employee requesting medical leave could always be terminated if she were unable to work at the time of her request. But that cannot be

_____

partially, again, in footnotes). The court finds the footnoted arguments to be sufficiently briefed and will exercise its discretion to consider them.

the case because we have held that "medical leave can constitute a reasonable accommodation under the ADA." We must therefore determine whether [the plaintiff] would be "otherwise qualified" to perform her essential job functions with her proposed accommodation, in other words, when she returned to work.

*Id.* (quoting *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 394 (6th Cir. 2017).

Regarding the question of whether the plaintiff would be otherwise qualified to perform her job upon her return to work, the court found it relevant that the plaintiff had been a "top producer" who was "always at work on time" prior to her illness and that the defendant had no reason to think her performance would deteriorate when she returned. *Id.* Based on this evidence, a "reasonable jury could find that [the plaintiff] could have returned to work and attended her job after she recovered from her illness," giving rise to a material factual dispute as to whether she was "otherwise qualified" for her position. *Id.*

So, too, in Moat's case. Although the defendant argues about the impact subsequent medical issues (unrelated to his back injury and surgery) would have had on Moat's ability to return to work, a reasonable jury could conclude that, as of June 2020 when he made the request to extend his IOD leave, Moat would be "otherwise qualified" to perform his job after a reasonable accommodation of extended IOD leave or light-duty work.

### 2. *Whether the Requested Accommodations Were Reasonable*

The next question is whether his request for extended IOD leave or alternative request for light-duty work for some period of time was facially reasonable in light of the evidence before the Commission and the NFD. Whether a proposed accommodation is reasonable is generally a question of fact. *Blanchet*, 27 F.4th at 1229–30. In *Blanchet*, the plaintiff argued that her request for temporary leave was reasonable, because her doctor provided the employer "a clear time frame" within which to expect her return to work, one of the employer's senior human resources officials considered a sixty-day extension to be possible, and the third-party administrator had

verbally approved the requested accommodation before the plaintiff received her termination letter from the defendant. The defendant countered that the doctor's note was too vague to constitute a definitive date, making the request unreasonable *per se*, and that neither the human resources official nor the third-party administrator was authorized to approve leave.

The court concluded that a reasonable jury could find that the doctor's note, predicting that the plaintiff would be able to return to work after two additional months of leave, was sufficiently definite, in light of the plaintiff's history of being a timely, reliable employee. The court declined to find that any particular amount of disability leave was *per se* unreasonable and found that the request for an additional two months of disability leave as an accommodation was reasonable in that case, based on the fact that the *defendant* considered it reasonable. *Id.* at 1230. In addition, it found that the defendant's "fatal administrative mistakes and lack of clarity regarding [the plaintiff's] termination date . . . raise[d] genuine disputes of material fact as to whether a 'reasonable accommodation' [in the form of additional leave] was possible." *Id.* at 1231.

The plaintiff analogizes his situation to that of the plaintiff in *Blanchet*. As the defendant points out, however, Blanchet's request for additional leave was denied and her employment was terminated. Here, the plaintiff's request to extend his IOD leave was denied, but he was not terminated. Instead, his request for disability pension was approved, and he was eventually reinstated as a firefighter after he was released to return to work without restrictions. In other words, the plaintiff's request for additional leave was actually granted—just at a lower rate of pay than he wanted. Moreover, at the Commission meeting at which his request for leave was taken up for consideration, the Commission and the NFD had before them only the plaintiff's medical records up through his most recent appointment with his neurologist in April 2020 and the doctor's May 2020 letter (based on the April 2020 examination), along with the plaintiff's own verbal

assurances that his condition had improved since then. As set forth above, on April 21, 2020, four months post-surgery, Dr. Aaronson noted that the plaintiff was "gaining some function" but continued to have significant pain, including with sitting, and needed to continue with intensive physical therapy and to stay off work completely. (Doc. No. 23-4, at 33.) Dr. Aaronson nonetheless "remain[ed] optimistic" that Moat would be able return to work as a fireman "12 months after his surgery" (*id.*)—eight months in the future. His May 17, 2020 letter reiterated that he "hope[d]" that Moat would be able to return to work by December 20, 2020. (*Id.* at 59.)

In other words, Moat's situation is not directly comparable to Blanchet's, and the evidence in his favor is not as robust. Nonetheless, a reasonable jury could find under all of the circumstances presented here that the plaintiff's request for an additional six months of IOD leave was reasonable, in light of his doctor's optimism that Moat would be ready to return to work by then, particularly in conjunction with Moat's own reports of "considerable progress" since his April appointment with Dr. Aaronson and his assurances that he wanted to go back to work. (Doc. No. 23-11, at 8.) A jury could also find that his alternative request for a brief extension of his IOD leave to allow him to seek a reevaluation from his doctor was reasonable. In addition, going on disability pension makes the reinstatement process more cumbersome, and it often takes longer than simply going from IOD leave to unrestricted work, as Shannon Hall implied during the Commission meeting when she observed that Metro departments have a "financial incentive" to return pensioned employees to work, "because after 60 days of being cleared to return to work, if they're not returned, [the Commission] starts billing the amount of the pension to the department." (Doc. No. 23-11, at 24.) In this case, the plaintiff was released to return to work as of March 10, 2021, submitted his request for reinstatement, but was not actually returned to work until July 1, 2021, more than three months later. Thus, there appears to be a substantive difference between

disability pension and IOD leave.

Despite the denial of his request for an extension, the plaintiff returned to his neurologist on June 18, 2020, just prior to the expiration of his IOD leave. He was, as he anticipated, released to return to light-duty work. (Doc. No. 23-4, at 25.) When he reiterated his request to Jamie Summers that he be considered for light-duty placement, she simply told him that he was not entitled to an extension of his IOD for purposes of either leave or light duty beyond the six months authorized by the Civil Service Rules, absent a waiver, which had already been denied. The plaintiff's application for a disability pension was granted instead. However, notably, the Civil Service Rules provide that "[a]n employee applying for a disability pension is required to notify his Appointing Authority, who will investigate the possibility of accommodating the employee's restrictions before the pension application is processed." (Doc. No. 23-5, at 3–4.) This statement suggests that the plaintiff's request for a temporary accommodation in the form of being placed on light-duty work should have been taken into consideration before he was approved for a pension. The defendant concedes that the NFD is "typically able to find light duty positions for employees who need them." (Doc. No. 28, Def.'s Resp. Pl.'s Statement of Additional Fact ¶ 6.) And, in terms of cost efficiency, it is at least possible that the NFD (and Metro), and the public at large, would be better served by paying an employee his full pay for actual work, even light-duty work, rather than half pay for no work at all.

Regarding the defendant's argument that the plaintiff's requests for accommodations were unreasonable in light of his subsequent medical issues, there is at least a question of fact as to whether Moat could have continued to work light duty while experiencing foot and ankle issues in the fall of 2020. Regardless, the question of whether other medical issues that arose *after* he requested an accommodation for his back injury in June 2020 might have affected his ability to

work goes to the quantification of damages rather than to whether the plaintiff can prove a claim based on the defendant's failure to accommodate his disability in June 2020. Finally, the court agrees with the plaintiff that the fact that Jamie Summers denied his request to work light duty out of hand, without directing him to submit his request to the Commission or any other party, gives rise to a question of fact as to whether she also had the authority to grant—or at least to consider—the request.

The court finds, in sum, that there is a material factual dispute as to whether the plaintiff's proposed accommodations were reasonable. *Accord Kiphart v. Saturn Corp.*, 251 F.3d 573, 587 (6th Cir.2001) ("[A] reasonable jury could have determined Saturn's policy of placing restricted employees on involuntary medical leave regardless of their ability to continue to perform in temporary positions was unreasonable.")). Because the defendant has not shown that either of the requested accommodations would have been unduly burdensome or that they would have resulted in the elimination of an essential job requirement, in view of the temporary nature of the requested accommodations, the defendant is not entitled to summary judgment on the plaintiff's ADA claim based on the failure to accommodate his disability.

## C.    ADA – Failure to Engage in Interactive Process

The ADA's implementing regulations state that, "[t]o determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the qualified individual with a disability in need of accommodation." 29 C.F.R. § 1630.2(o)(3). The Sixth Circuit recognizes that, while the interactive process is not incorporated in the text of the ADA, "the interactive process is mandatory, and both parties have a duty to participate in good faith." *Kleiber*, 485 F.3d at 871. Basically, "[o]nce an employee requests an accommodation, the employer has a duty to engage in an interactive process." *Blanchet*, 27 F.4th at 1232 (quoting *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 857 (6th Cir. 2018)). The purpose

of the duty is to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Rorrer v. City of Stow*, 743 F.3d 1025, 1040 (6th Cir. 2014) (quoting *Kleiber*, 485 F.3d at 871). However, failure to engage in the interactive process "is an independent violation of the ADA only 'if the plaintiff establishes a *prima facie* showing that he proposed a reasonable accommodation.'" *Hrdlicka v. Gen. Motors, LLC*, 63 F.4th 555, 572 (6th Cir. 2023) (quoting *Rorrer*, 743 F.3d at 1041).

The defendant here argues only that a failure to engage in the interactive process does not give rise to a stand-alone claim, separate from the failure-to-accommodate claim. (Doc. No. 18, at 8.) As set forth above, the plaintiff has made a *prima facie* showing that he requested a reasonable accommodation. The defendant arguably engaged with the plaintiff's request for an extension of his IOD leave when the Commission considered that request in an open meeting. The interactive process, however, is an going process. *See, e.g.*, *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 422 (6th Cir. 2022). The plaintiff's reiteration of his request to Summers for light-duty work after his doctor relaxed his work restrictions—which took place *before* his IOD leave expired and apparently before his disability pension had been processed—at least arguably triggered a duty on the part of Metro to consider that request rather than to simply defer to the plaintiff's already-denied request for an extension of his IOD leave. The Metro Civil Service Rules, as indicated, support that obligation rather than refute it.

Whether the claim is considered to be a separate claim or an extension of the failure-to-accommodate claim, the defendant is not entitled to summary judgment on the plaintiff's claim based on the defendant's alleged failure to engage in the interactive process.

### D. Disability Discrimination under the ADA and TDA

As previously stated, the ADA makes it unlawful for an employer to "discriminate against a qualified individual on the basis of a disability." 42 U.S.C. § 12112(a). A plaintiff may rely on

direct or indirect evidence to bring ADA claims. "Failure to accommodate and failure to engage in an interactive process . . . are evaluated under the direct-evidence standard, while disparate treatment and retaliation are evaluated on an indirect-evidence standard." *O'Donnell v. Univ. Hosps. Cleveland Med. Ctr.*, 833 F. App'x 605, 614 (6th Cir. 2020).

TDA claims are generally analyzed under the same principles as ADA claims. *Cardenas-Meade v. Pfizer, Inc.*, 510 F. App'x 367, 370 (6th Cir. 2013). The statutory schemes vary, however, insofar as (1) the TDA requires the plaintiff to prove that he suffered employment discrimination "based solely upon" his disability, Tenn. Code Ann. § 8-5-103(b); and (2) the TDA does not include a "reasonable accommodation" component. *Bennett v. Nissan N. Am., Inc.*, 315 S.W.3d 832, 842 (Tenn. Ct. App. 2009).

The FAC asserts that the defendant violated both the ADA and the TDA by discriminating against the plaintiff on the basis of his disability when it denied his request for an extension of his IOD leave "because of his disability." (FAC ¶ 44.) Metro construes the plaintiff's disability discrimination claim as a "disparate treatment" claim premised upon indirect evidence. A disparate treatment claim based on indirect evidence is analyzed under the *McDonnell Douglas* burden-shifting rubric, which requires the plaintiff first to establish a *prima facie* case of discrimination by showing that (1) he was disabled; 2) he was otherwise qualified for the job, with or without a reasonable accommodation; (3) he suffered an adverse employment decision; (4) his employer knew or had reason to know of the employee's disability; and (5) similarly situated employees were treated more favorably, or, if the plaintiff was terminated, his position remained open or he was replaced by a non-disabled individual. *O'Donnell*, 833 F. App'x at 619; *Rosebrough v. Buckeye Valley High Sch.*, 582 F. App'x 647, 651 (6th Cir. 2014).

Using this rubric, the defendant argues that Moat cannot establish elements (2), (3) or (5)—that is, he cannot show that he was "otherwise qualified" for his position, with or without a reasonable accommodation, for the same reasons as those discussed in connection with the failure-to-accommodate claim; that he suffered an adverse employment action; and or that any similarly situated *non-disabled* employees were treated more favorably than Moat was under analogous circumstances, largely because non-disabled employees would not be requesting an extension of IOD leave to accommodate a disability. (*See* Doc. No. 18, at 3.)

In response, the plaintiff contends that he has direct evidence of disability discrimination, in the form of the denial of his request for an accommodation, and that, "[w]here a failure to accommodate results in an adverse action . . . , that is considered direct evidence of disability discrimination and *McDonnell Douglas* is inapplicable." (Doc. No. 22, at 20.) The adverse action to which he points in support of his discrimination claim is the "reduction of his salary by approximately 50–60%." (*Id.*) In its Reply, Metro argues that the plaintiff fails to make out a disability discrimination claim that is analytically distinct from his failure-to-accommodate claim, because he does not allege a distinct discriminatory action apart from the alleged failure to accommodate. (Doc. No. 27, at 4–5.)

The court agrees. Those cases on which the plaintiff relies are distinguishable insofar as the plaintiffs in those cases alleged that the defendant failed to accommodate a disability and then took some other discrete adverse employment action against him based on the unaccommodated disability. For example, in *Dye v. Thomas More University, Inc.*, No. 2:19-CV-087-CHB, 2021 WL 4006123 (E.D. Ky. Sept. 2, 2021), the plaintiff, a tenured faculty member at the university operated by the defendant, began to suffer acute anxiety and panic attacks that were particularly triggered by being required to attend department meetings and campus events. The plaintiff

requested an accommodation in the form of being excused from attending department meetings and certain campus events. The university denied her request to be excused from attending campus events and then fired her for not attending those events. The court denied summary judgment on the plaintiff's failure-to-accommodate claim and then went on to deny summary judgment on the discriminatory discharge claim, stating:

> when a failure to accommodate leads to discharge for performance inadequacies resulting from the disabilities, this is considered direct evidence of discharge because of an employee's disability, in violation of the ADA. This is because failing to provide a protected employee a reasonable accommodation constitutes direct evidence of discrimination. Thus, "a company may not illegitimately deny an employee a reasonable accommodation to a general policy and use that same policy as a neutral basis for firing [her]."

*Id.* at \*14 (quoting *Equal Emp. Opportunity Comm'n v. Dolgencorp, LLC*, 899 F.3d 428, 435 (6th Cir. 2018)) (other internal quotation marks and citations omitted).

Similarly, in *Dolgencorp*, the plaintiff, who was diabetic and occasionally suffered life-threatening episodes of hypoglycemia, requested an accommodation for her disability in the form of being permitted to keep orange juice at her work station in case of emergency. Her manager denied this request based on "store policy." *Id.* at 432. After the denial of the request, the plaintiff experienced two episodes of hypoglycemia. On each occasion, she was not able to go to the break room to eat or drink something, because the store was full of customers and she was working alone. Instead, "she took a bottle of orange juice from the store cooler and drank it." *Id.* Each time, she paid for the juice and reported what had happened to her store manager. *Id.* The plaintiff was later fired for violating the store's "anti-grazing policy," which prohibited employees from "consuming merchandise in the store before paying for it." *Id.*

On appeal, the Sixth Circuit affirmed jury awards for the plaintiff on both her reasonable accommodation and discriminatory discharge claims, rejecting the defendant's argument that firing the plaintiff for violating the anti-grazing policy constituted a legitimate, non-discriminatory

basis for the termination. As quoted above, the court stated, "a company may not illegitimately deny an employee a reasonable accommodation to a general policy and use that same policy as a neutral basis for firing him." *Id.* at 435. The court then provided the following illustration:

> Imagine a school that lacked an elevator to accommodate a teacher with mobility problems. It could not refuse to assign him to classrooms on the first floor, then turn around and fire him for being late to class after he took too long to climb the stairs between periods. In the same way, Atkins never would have had a reason to buy the store's orange juice during a medical emergency if Dollar General had allowed her to keep her own orange juice at the register or worked with her to find another solution.

*Id.*

In this case, the plaintiff attempts to characterize the reduction of his salary as a separate adverse action. The reduction in his salary was not the result of a separate adverse action. Instead, the denial of the plaintiff's request for a reasonable accommodation was the adverse action. After his request was denied, the plaintiff applied for—and was granted—a disability pension and long-term medical leave. Admittedly, the salary that went with his disability pension was approximately half of his regular salary and substantially less than he would have made if his IOD leave had been expanded (ninety percent of his salary) or his request for light-duty work approved (100% of his salary). However, the granting of his request for a disability pension, *per se*, cannot be deemed a separate adverse or potentially discriminatory action, particularly in light of the fact that the plaintiff had to apply for the pension to receive it. True, he would not have had to apply for a disability pension if his request for an accommodation had not been denied, but this is not a situation in which he requested an accommodation and then a separate decision was made to fire him for failing to perform his job adequately based on the denial of the accommodation.

In short, the plaintiff's disability discrimination claim is co-extensive with his reasonable accommodation claim and does not constitute a stand-alone claim. To the extent the plaintiff is seeking to bring a separate cause of action based on the reduction of his salary in conjunction with

his receiving the disability pension that he affirmatively applied for after his accommodation requests were denied, the defendant is entitled to summary judgment on that claim.

## IV.     CONCLUSION

For the reasons set forth herein, the court will grant in part and deny in part the defendant's Motion for Summary Judgment (Doc. No. 17). An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge